Marion Heady v. Commissioner. The Union Trust Company of Indianapolis, Trustee under will of Harvey A. Tutewiler, Deceased, Transferee v. Commissioner.
Heady v. Commissioner
Docket Nos. 5812, 5813.
United States Tax Court
1945 Tax Ct. Memo LEXIS 115; 4 T.C.M. (CCH) 800; T.C.M. (RIA) 45261; July 24, 1945
John A. Alexander, Esq., 919 Circle Tower Bldg., Indianapolis, Ind., Troy G. Thurston, C.P.A., and George S. Olive, C.P.A., 528 Chamber of Commerce Bldg., Indianapolis, Ind., for the petitioners. Lester W. Ponder, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: These duly consolidated cases involve income tax deficiencies for the calendar year 1939 in the amounts of $981.80 (Docket No. 5812) and $43,539.19 (Docket No. 5813). In the first-mentioned (Marion Heady) there has been an addition to tax aggregating 25 percentum of the tax for failure to file a return. In the other case The Union Trust Co. of Indianapolis, Trustee, has been determined to be liable, as transferee of the assets of the Harvey A. Tutewiler Estate, for the income tax which became due before *116 it (The Trust Co.), as executor of the estate, turned the assets over to itself as trustee. Transferee liability is not denied if any tax is found to be due. The principal issue - common in both cases - is whether stockholders of The Ready Mixed Concrete Corporation realized capital gain or other income, recognizable for tax purposes under the applicable provisions of the internal revenue code, as the result of the distribution to them of $1 par value common stock and debentures in the aggregate face amount of $135,000 for its no par value common stock. In the event it is held that they realized taxable income then the correctness of the addition to tax in Docket No. 5812 must be determined. Many of the facts have been stipulated and by this reference are accordingly found. They are summarized in our findings. Others appearing therein are based upon evidence adduced at the trial. Findings of Fact Petitioner Marion Heady is a resident of Indiapanolis, Indiana. The Union Trust Company of Indianapolis (hereinafter referred to as the Trust Co.) is engaged in the banking and trust business in the city of Indianapolis and on December 13, 1938, qualified as Executor under the last *117 will and testament of Harvey A. Tutewiler, deceased. Tutewiler had been killed in an automobile accident on December 8, 1938. His estate was administered in the Probate Court of Marion County, Indiana. The Trust Co. filed a fiduciary income tax return for the year 1939 with the collector of internal revenue for the district of Indiana. On April 6, 1940, The Trust Co., as Executor of Tutewiler's estate, turned over to itself as Trustee under his last will and testament, the property remaining in the estate, including the stock and debentures hereinafter referred to. Ready Mixed Concrete Corporation (hereinafter referred to as the Corporation) was incorporated on March 7, 1931, under the laws of the State of Indiana with a capitalization of 1,000 shares of no par value common stock. It was then, and at the time of the trial still was, engaged in the business of manufacturing and selling mixed concrete from a central plant. Tutewiler, at the time of his death, was the owner of 888 shares of the 1,000 shares of the no par value common stock of the corporation and Marion Heady owned the remaining 112 shares. In Tutewiler's will it was directed that his interest in the corporation *118 should be sold by his Executor, the provision reading as follows: "I direct my Executor to sell all of my interest in the Ready Mixed Concrete Corporation and Standard Paving Company as promptly after my death as a purchaser for a fair consideration can be found. I authorize said Executor to make such sale either for cash or partly for cash and partly on credit under such terms and conditions as said Executor and my wife, Ora H. Tutewiler, or my daughter, Martha Tutewiler Simpson, shall deem proper. I enjoin my Executor not to operate the business of the Ready Mixed Concrete Corporation or Standard Paving Company for any greater length of time after my death than may be absolutely necessary, and it is my express direction that my interest in said corporations shall be sold promptly after my death whether or not such a sale may be necessary for the purpose of providing cash to pay my debts, expenses of estate administration or taxes." Shortly after qualifying as executor the Trust Co. filed with the Probate Court its petition for authority to sell the stock of Ready Mixed Concrete Corporation, which the estate owned, in accordance with the direction of decedent's will. On the same *119 day, the Court entered an order directing the executor to offer the 888 shares for sale for cash at not less than the full appraised value, and fixed the terms and conditions of sale; including a direction that the executor give notice of the sale by publication in The Indianapolis News, The Indianapolis Star and The Indianapolis Times not less than ten days prior to the date of sale. The three newspapers are daily newspapers and have the greatest circulation in the city of Indianapolis. An earnest effort was made to obtain a cash offer for the stock. Numerous individuals expressed to the executor and to the attorney for the estate an interest in making a bid for the stock owned by the estate and the 112 shares owned by Marion Heady; but at the time scheduled for the sale on February 20, 1939, only one bidder appeared who made a real offer. It was to pay cash in the sum of $88,800, for the stock owned by the estate, and $11,200 for the shares owned by Marion Heady. This offer was below the appraised value of the estate's shares and did not conform with the terms of sale prescribed by the court. Efforts were made by the executor and its attorney to induce the bidder to raise his offer *120 and efforts were also made to procure another and better offer, but without success. On March 2, 1939, the executor reported to the Probate Court that it had been unable to effect a sale of the stock in accordance with its order. On the same day the court terminated the authority of the executor to sell the stock and directed the executor to hold it until further order of the court. Following the unsucessful efforts to sell the stock the executor was confronted with the direction of the decedent's will that it should not operate the business for any greater length of time than should be absolutely necessary, and efforts were made to procure satisfactory management for the business. The ready mixed concrete business is one in which success is largely dependent upon management, rather than physical plants, patents or particular technical skill. Personal contacts and friendships with potential users of concrete are essential to profitable operation. It was recognized by the executor and the attorney for the estate that capable management would be essential to the continued success of the business and efforts were made to secure the services of Chesleigh Gray, considered by the representatives *121 of the estate to be the best person to be entrusted with the corporation's management. Gray, a resident of Indianapolis, was the Indianapolis manager of American Aggregate Corporation, from which all of the sand and gravel used by Ready Mixed Concrete Corporation was then being purchased. The securing of adequate supplies of sand and gravel was a critical problem of the corporation at the time and considerable effort was devoted to making certain that the source of supply of its aggregates would not be cut off. Gray had had extensive experience in the management and use of ready mixed concrete. He had been largely responsible for inducing decedent to form the corporation in 1931, had advised him as to the arrangement of the plant and had aided him in sales of ready mixed concrete. They dealt with the same clientele and had been business and personal friends. Gray was approached by representatives of the estate, including the widow of the decedent, and asked if he would consider taking over the management of the corporation. (Mrs. Tutewiler and the attorney for the corporation had previously consulted with and secured the consent of Gray's then employer to discuss the matter with *122 him.) Gray advised them that he was not willing to take over the management of the corporation on any basis under which he received only a salary, or a salary and a bonus as compensation for his services. He stated that he was willing to undertake the management under an arrangement which would enable him to acquire an ownership in the corporation if his management proved successful. The estate offered to sell him the stock; but he was not financially able to purchase it. The representatives of the estate were unwilling to enter into an agreement for the sale or other disposition of the stock unless control should be retained until the estate had realized what it considered to be a fair value. A plan was finally agreed upon which they felt protected the interests of the estate. On June 6, 1939, the Articles of Incorporation of the corporation were amended, providing for the issuance of 1,000 shares having a par value of $1 per share. The 1,000 shares of no par value common stock, which had theretofore been authorized and issued, were replaced by 1,000 shares of common capital stock having a par value of $1 per share and $135,000 face amount of seven percent debenture notes, maturing *123 serially from five to twelve years after June 1, 1939, were issued. These shares of new common stock and the $135,000 face amount of debenture notes were exchanged, pro rata, for the outstanding 1,000 shares of no par value common stock. The fair market value of the debentures on June 6, 1939, was $120,000. The executor received 888 shares of the new stock and debentures having an aggregate face value of $119,880 and a fair market value of $106,560 in exchange for the 888 shares of common stock of no par value theretofore owned by it. Marion Heady received 112 shares of the new stock and debentures having an aggregate face value of $15,120 and a fair market value of $13,440, in exchange for the 112 shares of common stock of no par value theretofore owned by her. The issuance of debentures and new stock of the corporation occurred on June 6, 1939. They were issued as of June 1, 1939, approximately concurrently with the execution of a contract dated June 7, 1939, the terms of which had previously been agreed upon. Following conferences between the interested parties, the executor-trustee, the corporation, Marion Heady, decedent's widow and decedent's daughter, all entered into a *124 contract with Gray on June 7, 1939. In this contract the executor and Marion Heady gave Gray an option to purchase, from time to time, all shares of the common stock of the corporation in blocks, the right to purchase said shares being contingent upon the corporation's having retired a designated amount of its debentures, the purchase of stock by Gray to be made, on a pro rata basis, from Marion Heady and the estate or trust. Col. I of the schedule below shows the number of shares which may be purchased when the outstanding debentures have been reduced to the amounts shown in Col. III and Col. II shows the amount per share which is to be paid. Col. I
Col. II
Col. III
50
$200.00
$117,500
50
200.00
100,000
75
200.00
82,500
100
150.00
65,000
100
150.00
47,500
100
150.00
30,000
525
73.50
12,500
The option to purchase the shares of stock was to become void upon the death of Gray, the termination of his employment by the corporation, or his failure to devote all of his income from the corporation in excess of $8,000 per annum, after the deduction of Federal income taxes on such excess, to the purchase of the stock. Gray was obligated to devote *125 his income from the corporation in excess of the $8,000 per annum to the purchase of such stock whether his income had been derived from salary, bonuses or dividends. He also obligated himself to lend to the corporation, from time to time, all of his income from the corporation over and above the amount used to purchase stock, the loans to bear interest at the rate of one and one-half per centum per annum but to be junior and subordinate in all respects to the debentures of the corporation. The corporation agreed to employ Gray as its general manager at a salary of $8,000 per annum, with an annual bonus based upon a percentage of the net profits without deduction for interest on indebtedness owed by the corporation or for Federal income and excess profits taxes payable by the corporation. Gray was given broad powers of management. He, by the contract, also granted to the executor (and trustee) and to Marion Heady an option to repurchase any shares of the common stock, which he had purchased under the terms of the contract, at $150 per share, such option to be valid only in the event of the death of Gray, or the termination of his employment prior to the time he had the right under *126 the contract to acquire all remaining shares of stock. The parties to the contract agreed that the corporate earnings for the year 1938 - $31,875.28 - which had not been paid out as dividends, should be paid out as dividends at such time or times as the board of directors might determine and that any dividend received by Gray on account of such prior earnings should be paid by him to Marion Heady (11 2/10%) and to the executor and trustee (88 8/10%). The parties to the contract agreed that the beneficiaries of decedent's trust (his widow, Ora H. Tutewiler, and his daughter, Martha Tutewiler Simpson), should not be entitled to the principal of any of the debentures, but that they should constitute a part of the corpus of the trust estate. The contract was entered into contingent upon the approval thereof by the Probate Court of Marion County, Indiana. Such approval was given on June 13, 1939. The corporation promised to pay to the order of the Trust Co. as executor and trustee of the estate of Tutewiler, on the designated dates, the respective amounts set forth in series A to H, inclusive, of the debentures issued by the corporation. It reserved the right to prepay the debentures *127 in whole or in part at any time, without notice, at the face value remaining unpaid, plus full interest to the date of redemption. It promised to prepay said debentures prior to the maturity thereof from any of its funds available on dates when redemption and prepayment could be made. No recourse for the payment of principal or interest of the debentures existed against any present or future stockholders, officers or directors of the corporation. The exchange of the no par value common stock for an equal number of shares of $1 par value common stock and long term debenture obligations of the corporation did not effect any change in the voting rights of the shareholders. The purpose of the exchange of stock of the corporation for stock and debentures was to segregate the accumulated corporate earnings and to make certain that petitioners, as stockholders, would receive them. No corporate business purpose for the transaction has been shown. The books of the corporation immediately before and after the exchange on June 6, 1939, reflected the following: Before
After
June 6, 1939
June 6, 1939
ASSETS
Total Net Current and Fixed Assets
$158,317.83
$158,317.83
Goodwill
47,336.90
$158,317.83
$205,654.73
LIABILITIES
Debenture Notes Payable
7% due serially June 1, 1944, to June 1, 1951
$135,000.00
RESERVES
453.50
453.50
CAPITAL STOCK - 1,000 shares no par value
17,532.26
CAPITAL STOCK - 1,000 shares $1.00 par value
1,000.00
UNADJUSTED NET PROFITS FOR FIRST 5
MONTHS 1939
37,325.95
37,325.95
SURPLUS RESERVED PER CONTRACT EX-
HIBIT 6
31,875.28
SURPLUS
103,006.12
$158,317.83
$205,654.73
*128 For the first five months of the year 1939 Ready Mixed Concrete Corporation had net earnings in the amount of $37,325.95 after deduction of operating expenses. Its net income for the entire year 1939, after taxes and salaries, was $44,768.19. A cash dividend of $10 per share was paid on December 26, 1939, $8,880 to the Trust Co. and $1,120 to Marion Heady. The management contract with Gray of June 7, 1939, was still in effect at the date of the trial of the instant cases. $82,500 of the $135,000 of debentures issued by the corporation were then outstanding. In the fiduciary return filed by the executor no amount representing gain or other income resulting from the receipt of the new common stock and debentures of Ready Mixed Concrete Corporation in exchange for the 888 shares of common stock was included in gross income. Marion Heady filed no return of income for the year 1939. In determining the deficiencies in tax the Commissioner included in gross income, as taxable dividends, the face value of the debentures received by the estate and Marion Heady on June 6, 1939, 62.7271 percent of the cash dividend received by each on December 29, 1939, was also included in gross income. *129 Petitioners contend that no amount should be included in gross income in connection with the receipt of the debentures and that 100 percent of the cash dividend should be included. Opinion Petitioners contend that the issuance of $1 par value common stock and debentures by the Ready Mixed Concrete Corporation in exchange for its no par value common stock constituted a recapitalization and reorganization of the corporation under Section 112 (g), I.R.C., and that no gain or loss on the exchange is recognizable under the provisions of Section 112 (b) (3), I.R.C. In the alternative they contend that if gain is recognized, it should be treated as a capital gain and not as a dividend. Respondent contends that there was no statutory reorganization and that the distribution to petitioners of the debentures in the face amount of $135,000 on June 6, 1939, constituted a distribution taxable as a dividend, either under section 115 (a) or under section 115 (g) I.R.C., to the extent that the corporation had earnings and profits available for dividend distribution. He also contends that inasmuch as Marion Heady failed to file *130 a return for 1939, a penalty of 25 percent must be added to the deficiency in her income tax for that year. Section 112 (g) (1) (D) states that a recapitalization of a corporation is a statutory reorganization. Section 112 (b) (3) provides that no gain or loss shall be recognized upon an exchange of stock for stock or securities in the same corporation pursuant to a plan of reorganization. The readjustment of the capital structure of the corporation on June 6, 1939, and the exchanges made by petitioners constituted a literal compliance with the provisions of the statute. Since the decision in Gregory v. Helvering, 293 U.S. 465, however, in order for a taxpayer to secure the benefits of the reorganization provision it must appear that the reorganization had as its objective a legitimate business purpose, and the purpose must be germane to the business of the corporation. "A mere desire to effect a change in the form in which their [stockholders] property interests were held, but in such a manner as to escape the tax consequences otherwise called for, would not under the Gregory case furnish the necessary validating purpose." Alice H. Bazley, 4 T.C. 897, 901, *131 (on appeal 3 C.C.A. * ). Respondent urges that there was no valid business purpose to the corporation present in connection with the issuance of the debentures and that the real reason for their issuance and the execution of the contract providing that Gray could not obtain control of the corporation until they had been completely paid, was to assure the old stockholders that they would receive the entire earnings of the corporation which had been accumulated prior to the execution of the contract on June 7, 1939. Petitioners urge that the recapitalization had a true business purpose because it was effected in order to enable the corporation to induce Gray to take over the management of its affairs. The events which culminated in the recapitalization have been set forth in our findings. Summarizing them, after the death of the decedent and the unsuccessful attempt to sell the corporation's stock in accordance with the will of the decedent, the corporation was faced with the problem of securing a competent manager. Gray was the only acceptable prospect; but he was not interested in the position solely on a *132 salary basis. He indicated he would be interested if some plan were devised whereby he, in addition to a salary, could acquire a substantial stock interest in the business. The estate offered to sell the business or its stock to him; but he was not financially able to purchase it. Negotiations were then entered into between him and the representatives of the estate and the beneficiaries under decedent's will with a view to working out an arrangement which would induce him to take over the management of the corporation. Thereafter the corporation was recapitalized and the contract of June 7, 1939, was executed. Prior to the recapitalization the corporation had 1,000 shares of no par value common stock outstanding and subsequent thereto 1,000 shares of $1 par value common and $135,000 in debentures. The issuance of the debentures was, therefore, the principal change effected. So far as the stockholders were concerned they owned the same number of shares after as they owned before the recapitalization. If the recapitalization had a business purpose to the corporation, it must be because it derived some business advantages from the issuance of the debentures. Frequently a corporation *133 effects a recapitalization for the purpose of warding off financial difficulties facing the enterprise or to strengthen its position by revamping its capital structure. Cf. Jacob Fischer, 46 B.T.A. 999, appeal dismissed C.C.A. 6, June 3, 1943. But no such reason or purpose has been shown here. Petitioners urge that the purpose of the recapitalization was to enable the corporation to meet Gray's demands for an interest in its stock and thus to induce him to take over the management of its business. How the issuance of $135,000 in debentures, the principal change in capital structure of the corporation, assisted in securing Gray's services is not disclosed; and we are not convinced that that was the purpose which motivated the corporation in issuing them. Gray testified he did not suggest the issuance of the debentures and that the suggestion they be issued came from the representatives of the estate and Marion Heady. He also testified he would have entered into the contract of June 7, 1939, with similar bonus provisions, if the old stock of the corporation had still been outstanding on that date and no debentures or new stock had been issued by the corporation. It seems *134 quite apparent, therefore, that if Gray did not suggest the issuance of the debentures, and under his contract he was to acquire no interest therein, their issuance was not an inducement for him to execute the contract and assume the managership of the corporation. The evidence preponderates in favor of the view that the real purpose of the recapitalization was to protect the interests of the stockholders in the accumulated surplus and earnings of the corporation. Prior to the recapitalization the surplus amounted to $103,006.12 and the net earnings for the first five months of 1939 aggregated $37,325.92, a total of $140,332.07. The amount of debentures issued was $135,000. In the contract of June 7, 1939, the petitioners granted Gray the option to purchase all of the common stock owned by them "in blocks, at the prices, at the times and on the conditions" therein specified. Gray was given the option to purchase 50 shares when the outstanding debentures were reduced to $117,500, 50 more when they were reduced to $100,000, etc., and the contract contemplated the payment of substantially all of the debentures before Gray could acquire a majority of the shares. Thus the petitioners *135 were assured that they, as stockholders, would receive the amount of the accumulated surplus and earnings existing on June 7, 1939, prior to the acquisition by Gray of a controlling interest in the corporation's stock. The issuance by a corporation of debentures in an amount substantially equivalent to the amount of its surplus and accumulated earnings so that its stockholders may protect their respective interests therein in a transaction with an individual who is to acquire ownership of their stock, does not, in our judgment, constitute the reorganization of a corporation for a "business or corporate purpose." Gregory v. Helvering, supra. It is merely a segregation of corporate earnings for the benefit of the stockholders. Petitioners cite several cases decided by this tribunal in support of their contention that the recapitalization constituted a statutory reorganization. In South Atlantic Steamship Line, 42 B.T.A. 705, a corporation in a distressed financial condition rearranged its corporate structure in order to strengthen its financial condition and permit it to eliminate its dividend arrears. In Jacob Fischer, supra, the purpose of *136 recapitalization was to secure a wider holding of a corporation's shares, thereby promoting a more extensive distribution of its business and establishing a market for the shares. In Clarence J. Schoo, 47 B.T.A. 459, appeal dismissed C.C.A. 1, 25-year debenture bonds were issued in exchange for preferred stock in order to eliminate one of two classes of preferred stock outstanding and $7.50 par value common was substituted for no par value common with the object of reducing the transfer taxes exacted upon the transfer of shares. In Edgar M. Docherty, et al., 47 B.T.A. 462, a recapitalization of a closely owned corporation was effected as a means of facilitating the purchase of shares held by any of its four stockholders in the event of his death, and thus to assure the continuance of harmonious ownership and control. (Upon appeal to C.C.A. 1 the parties filed a joint motion to remand and decision was entered upholding respondent's determination of deficiencies.) In each of those cases the recapitalizations were held to have been consummated for valid corporate and business purposes. They are of slight value as precedents, however; for each depends upon its *137 own peculiar facts. Several of the other cases upon which petitioner relies were distinguished in Alice H. Bazley, supra, and it would serve no useful purpose to repeat the discussion here. Since the filing of briefs in this case we have again reviewed the applicable authorities and rules of law in Adam A. Adams, 5 T.C. 1186 (promulgated June 29, 1945). In the latter case we held, under facts somewhat analogous to those now before us, that a substantial part of the accumulated earnings of the corporation had been distributed to the stockholders by means of the issuance of a large block of debentures. The inclusion of the fair market value of such debentures in the gross income of the recipient of them was therefore approved. Much that was said in that case is equally apposite here. Our conclusion is that the corporate business purpose necessary to effectuate a statutory reorganization has not been established. The recognition of gain or loss therefore is not forbidden by section 112 (b) (3), supra. We deem it unnecessary to discuss petitioners' alternative contention that the transaction constituted a reorganization under clause (F) of section 112 (g) (1), I.R.C. *138 as "a mere change in identity, form or place of organization", inasmuch as the statutory reorganization described therein also must be consummated for a valid business purpose, which has not been established. Petitioners urge that if gain is to be recognized on the transaction, it should be recognized as a capital gain. Respondent argues that the distribution of the debentures to the petitioners constituted a distribution taxable as a dividend either under section 115 (a) or under section 115 (g) I.R.C. to the extent of the fair market value of the debentures. An extended discussion of these contentions is unnecessary and would involve a repetition of what has already been said in connection with the lack of corporate business purpose. It is sufficient to say that the real purpose of the recapitalization and distribution of new stock and debentures for old stock was to protect the interests of the stockholders in the accumulated surplus and earnings which were in excess of $135,000, the amount of the debentures issued. When the transaction was completed the stockholders had the same number of shares of common stock as before. The only change effected in their *139 interests was that prior to the distribution of the new stock for old they had only a right to participate in the accumulated earnings and profits, if and when a dividend was declared, whereas subsequent thereto their right to receive these accumulated earnings in the amount of $135,000 was established just as effectively as though a dividend had been declared. In other words, earnings which had been the property of the corporation were set aside for the benefit of the stockholders and the corporation's surplus was eliminated. It may not be amiss to point out that in our opinion there is also considerable merit to respondent's contention that the distribution of the debentures constituted a dividend under section 115 (a), I.R.C. Cf. Commissioner v. Bedford's Estate, 325 U.S. 283, 65 S. Ct. 1157. This section provides that the term "dividend" means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year. Looking realistically at the transaction the stockholders of the Ready Mixed Concrete Corporation *140 surrendered nothing but merely received the debentures. The common stock represented the entire ownership of the corporation both before and after the exchange and there was no change in the number of shares held by each petitioner. All that was accomplished, therefore, was a segregation of earnings for the benefit of petitioners. Respondent urges that his determination that the debentures had a fair market value of $135,000 at the time of their receipt on June 6, 1939, should not be disturbed, pointing to the fact that the corporation had surplus and net earnings of $140,332.07 on that date and that the debentures were its only outstanding obligation. We have found as a fact, however, that the value of the debentures on June 6, 1939, was $120,000. The stock was reported for estate tax purposes as having a value of $150 per share on the date of decedent's death, and thereafter the corporation had substantial earnings. One of petitioners' witnesses testified that the stock of the corporation prior to the exchange was worth from $140,000 to $150,000, and that he would allocate this value "70 to 80 per cent" to the debentures and 20 to 25 per cent to the new stock. Our best judgment *141 is that the executor of the decedent's estate should have reported the receipt of a dividend of $106,560 and Marion Heady should have reported the receipt of a dividend of $13,440. Marion Heady did not file a Federal income tax return for the year 1939. The evidence does not disclose that her failure to do so was due to reasonable cause. The 25 percent addition to tax provided for in section 291 I.R.C. therefore must be added to the deficiency due from her. It has been stipulated the Union Trust Company of Indianapolis, as trustee under the will of decedent and transferee of the assets of the estate, is liable for any deficiency found to be due because of the failure of the executor to treat the transaction as a dividend distribution. It is accordingly held liable as a transferee for the tax due from the estate. Decision will be entered under Rule 50. Footnotes
*. TC decision affirmed by CCA-3, 46-1 USTC [*] 9135.↩