## COMMISSIONER OF INTERNAL REVENUE v. CHAMPION.

### No. 6688.

Circuit Court of Appeals, Sixth Circuit.
June 29, 1935.

Morton K. Rothschild, of Washington, D. C. (Frank J. Wideman and Sewall Key, both of Washington, D. C., on the brief), for petitioner.

Walter S. Gordon, of Cleveland, Ohio, for respondent.

Before MOORMAN, HICKS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Petition by the Commissioner of Internal Revenue to review an order of the Board of Tax Appeals. The Commissioner determined a deficiency in respondent's income taxes of $576.70 for 1928 and of $5,523.70 for 1930. The Board found an overpayment of $5,005.92 for 1928 and a small underpayment of $302.04 for 1930.

The evidentiary facts are undisputed. Summarized, they are as follows: Champion Rivet Company was organized in 1903 for the manufacture of steel rivets. Respondent was one of the organizers and has since been its president and a director. Before March 1, 1913, he owned 238 shares of its common stock in his own name and two additional shares standing in the names of nominees. On January 8, 1922, he inherited 240 additional shares from his wife's estate.

The company's main plant was at Cleveland, Ohio. Its raw material was purchased near Cleveland, but it was compelled to pay for it on the "Pittsburgh base price" plus the freight from Pittsburgh. The raw material cost constituted about 70 per cent. of that of the finished product, and this high initial cost due to "Pittsburgh plus" prices placed it at a disadvantage in respect to its Pittsburgh competitors. To meet this situation a group of stockholders had for a number of years insisted that it should build a plant at Pittsburgh, and for this purpose in 1919 it purchased a plot of ground near Pittsburgh for $165,000, and subsequently plans were prepared for a plant there which would cost approximately $2,000,000.

On December 18, 1922, the stockholders by resolution authorized an increase of the capital stock from $100,000 to $1,-600,000 to consist of 8,000 shares of common with a par value of $100 per share and 8,000 shares of 7 per cent. cumulative preferred with the same par value; the preferred shares to be redeemable in whole or in part at $105 per share, with payment prorated according to the preferred holdings. The board of directors was authorized to declare a stock dividend and to distribute the increase, both common and preferred, among the stockholders in proportion to their holdings, i. e., 8 shares of preferred and 7 shares of common stock for each $100 share of original stock owned by the stockholder.

On December 27, 1922, the board of directors carried out the resolution, declaring the stock dividend, and authorizing the transfer of $1,500,000 from earned surplus to capital, on which date the company had an existing earned surplus of $2,667,-407.22; $2,121,592.25 of which had been accumulated subsequent to March 1, 1913.

On December 20, 1922, respondent received in exchange for his 480 shares of old common stock, 3,840 shares each of the new preferred and common. On March 14, 1925, he gave 1,920 shares each of

preferred and common to trustees for his children, leaving himself a balance of 1,920 shares of each kind of stock.

The capital increase was made in contemplation of an enlargement and extension of the company's plants, including the proposed Pittsburgh plant, with a view of achieving economy in operation and freight rate·payments. The move was thought to be warranted by improved business conditions. However, the Pittsburgh construction was delayed, and in 1924 the "Pittsburgh plus" method of fixing steel prices was abolished by the Federal Trade Commission and the plant became unnecessary.

The anticipated improvement in business failed to materialize, and the condition is reflected in the dividend and surplus accounts. The decline was due to an increased use of the electric welding process. In 1928 competition forced a reduction in the price of boiler rivets to that of structural rivets, representing on that item alone a loss of $4 per ton. Further loss of business forced the company into the manufacture of electric welding rods. The move was made reluctantly and was long delayed because it involved an entirely different process of manufacture, and because it was thought the practice of welding was but a temporary innovation.

In 1930 the company sold about two acres adjoining its Cleveland plant for $30,000.

On September 18, 1928, the stockholders of the company adopted the resolution printed in the margin.[1]

Thereafter the company redeemed 2,000 preferred shares on October 1, 1928; 2,000 on October 1, 1929; 2,000 on July 3, 1930; and 1,000 in 1931, all at $105 per share. Respondent surrendered for redemption his proportionate number of preferred shares each time, receiving for 480 shares $50,400 on October 1, 1928, and a like amount for the same number in 1930. The amounts he received in 1929 and 1931 are not involved.

Before, during, and after these transactions, the proportionate interest of the stockholders in the total stock and voting power remained unchanged, except for an increase from 16.37 per cent. to 16.46 per cent. in one instance, and a reduction from 63 per cent. to 54 per cent. in the other.

The Commissioner computed respondent's tax upon the $50,400 received by him in 1928 and upon a like amount received by him in 1930 under section 115(g) of the Revenue Act of 1928. 45 Stat. c. 852, page 822, 26 U. S. C., § 2115(g), 26 USCA §.2115(g). He determined that the ·stock redemptions were essentially equivalent to the distribution of a taxable dividend under that act. The Board found to the contrary. The determination of whether it was or was not was one of fact for the Board upon consideration of the evidence. Commissioner v. Babson, 70 F.(2d) 304, 306 (C. C. A. 7); Randolph v. Commr., 76 F.(2d) 472, 476 (C. C. A. 8); Commissioner v. Straub, 76 F.(2d) 388 (C. C. A. 3).

Without undertaking an analysis of the evidence stated, we conclude that it was ample to sustain the finding of the Board. Phillips v. Commr., 283 U. S. 589, 600, 51 S. Ct. 608, 75 L. Ed. 1289; Tracy v. Commr., 53 F.(2d) 575, 578 (C. C. A. 6).

Not every redemption of its stock by a corporation is essentially equivalent to the distribution of a taxable dividend. Whether it is "depends upon the circumstances of each case." Treas. Reg. 74, art. 629, under Revenue Act of 1928. Under the statute, consideration must be given to the time at which and the manner in which the redemption is made. There is a reasonable inference that shrinkage in its business brought the company face to face with the realization that its capital was in excess of its needs and to that extent unprofitable, and that the increase in capitalization had been a mistake. Under such circumstances, good business judgment might naturally suggest a redemption proportionate to the decline in business. Redemption under such conditions is not essentially equivalent to the distribution of a taxable income and may not be treated as

---

[1] "Resolved, that this corporation redeem 2000 shares of its preferred stock at the redemption value thereof, to wit, $105.00 per share; that the shares so redeemed be surrendered pro-rata by the present holders of preferred stock in the Company in the proportion of their respective holdings of said stock, and that the shares so redeemed be canceled and retired and not thereafter reissued, said redemption to become effective as of October 1, 1928; and that the stated capital of this corporation be reduced accordingly and a certificate of said action be filed with the Secretary of State of Ohio."

a taxable dividend under section 115(g), supra. The taxation of profits arising from such character of distribution is otherwise provided for. Revenue Act of 1928, § 115(c, h), 45 Stat. c. 852, p. 822, 26 U. S. C., § 2115 (c, h), 26 USCA § 2115 (c, h).

The decision of the Board of Tax Appeals is affirmed.