COMMISSIONER OF INTERNAL REVENUE *v.* ESTATE OF BEDFORD ET AL.

No. 710. Argued March 29, 1945.—Decided May 21, 1945.

*Miss Helen R. Carloss*, with whom *Solicitor General Fahy, Assistant Attorney General Samuel O. Clark, Jr., Mr. Sewall Key* and *Miss Helen Goodner* were on the brief, for petitioner.

*Mr. Erwin N. Griswold*, with whom *Mr. Holt S. Mc-Kinney* was on the brief, for respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

At the threshold, the jurisdiction of the Court is challenged on the ground that the petition for the writ of certiorari was not filed within three months after "entry" of the "judgment" below as required by the Judiciary Act of February 13, 1925.[1]

---

[1] "Sec. 8 (a). That no writ of error, appeal, or writ of certiorari, intended to bring any judgment or decree before the Supreme Court for review shall be allowed or entertained unless application therefor be duly made within three months after the entry of such judgment or decree, excepting that writs of certiorari to the Supreme Court of the Philippine Islands may be granted where application therefor is made within six months: *Provided*, That for good cause shown either of such periods for applying for a writ of certiorari may be extended not exceeding sixty days by a justice of the Supreme Court." 43 Stat. 936, 940, 28 U. S. C. § 350.

The steps by which the case came here are these. On August 8, 1944, the Circuit Court of Appeals for the Second Circuit filed a document entitled "Opinion"; on the same day, the Clerk made a docket entry reading, "Order reversed, A. N. Hand, *C. J.*"; on August 29, 1944, a document entitled "Order for Mandate" was filed, and the mandate issued that day; on November 29, 1944, the petition for writ of certiorari was filed. The petition was filed too late if the "Opinion," as respondent contends, constitutes the "judgment." It was filed in time if the "Order for Mandate" may properly be deemed the "judgment." The issue was ably pressed before us, and, since it concerns our power to review cases coming from what is perhaps the busiest circuit, it calls for more than summary treatment.

Even long continued practice cannot alter the limits within which Congress has bound the appellate jurisdiction of this Court. See *Dept. of Banking* v. *Pink*, 317 U. S. 264. But such practice may be decisive in interpreting procedural ways which, as a matter of dialectic or abstract analysis, may appear dubious. We are naturally impressed by the common understanding that in the Circuit Court of Appeals for the Second Circuit the so-called "Order for Mandate" is deemed the judgment. Robertson and Kirkham, Jurisdiction of the Supreme Court of the United States (1936) § 384. We have taken and decided as a matter of course a considerable number of cases in which certiorari was sought within three months after entry of the "Order for Mandate" but not within three months after the "Opinion." [2] This practical understanding of the controlling significance, for appellate

---

[2] During the 1941, 1942 and 1943 Terms, this Court entertained reviews and affirmed judgments of the Circuit Court of Appeals for the Second Circuit in not less than ten such cases: *Commercial Molasses Corp.* v. *N. Y. Barge Corp.*, 314 U. S. 104; *New York* v. *United States*, 315 U. S. 510; *Mother Lode Co.* v. *Comm'r*, 317 U. S. 222; *Smith* v. *Shaughnessy*, 318 U. S. 176; *Helvering* v. *Griffiths*, 318 U. S.

purposes, of the "Order for Mandate" is supported and certainly not contradicted by all that is conveyed by the "Opinion" and "Order for Mandate" and the Rules of the lower court.

It does not detract from the "Opinion" as an opinion that in its heading it gives as dates "Argued January 6, 1944. Decided August 8, 1944," and that it concludes with "The order of the Tax Court is reversed." The same or similar phrases are commonly employed in opinions of this Court without changing their character as opinions. Nor do like phrases in the opinions of the other circuit courts of appeals turn them into judgments, since in all other circuits judgment orders are separately filed. In spite of its title, the "Order for Mandate" on its face fulfills the function of such a judgment order. It recites that

"it is now hereby ordered, adjudged, and decreed that the order of said The Tax Court of the United States be and it hereby is reversed.

"It is further ordered that a Mandate issue to the said The Tax Court of the United States in accordance with this decree.

ALEXANDER M. BELL,<br><i>Clerk.</i><br>By A. DANIEL FUSARO,<br><i>Deputy Clerk."</i>

This language plainly imports that this is the judgment and that it is then being rendered. Nor does the fact that the order was prepared by the clerk and bears his signature detract from its quality as a judgment. A judgment "is the act of the court," *Ex parte Morgan,* 114 U. S. 174, 175, even though a clerk does all of the ministerial acts, as here, in conformity with his court's standing instructions.

---

371; *Emil* v. *Hanley,* 318 U. S. 515; *Fisher Co.* v. *Witmark & Sons,* 318 U. S. 643; *Equitable Society* v. *Comm'r,* 321 U. S. 560; *Medo Corp.* v. *Labor Board,* 321 U. S. 678; *United States ex rel. Brensilber* v. *Bausch & Lomb Optical Co.,* 320 U. S. 711 (equally divided court).

The Rules of the court below governing opinions, rehearings, issuance of mandate and stay of mandate are invoked to show that the "Opinion" is the appealable "judgment." These Rules, like other rules, are not phrased with such fastidious precision as to make of all the parts a perfect harmony. But while substantial debating points may be taken,[3] nothing in these Rules contradicts the natural meaning yielded by the terms of the "Opinion" and the "Order for Mandate," as reflected in the practice of the Second Circuit and in our own, which treats not the "Opinion" but the "Order for Mandate" as the order of judgment. The Rules would have to be far less artistic than they are to warrant us in holding that the Circuit Court of Appeals has consistently misinterpreted some of its own Rules. Whether the announcement of an opinion and its entry in the docket amounts to a judgment for purposes of appeal or whether that must await some later formal act, ought not to be decided on nice-spun argumentation in disregard of the judicial habits of the court whose judgment is called into question, of the bar practising be-

---

[3] Respondent argues that the Rules of the court below, with respect to the opinions of the court, rehearings, issuance of mandate, and stay of mandate, show that the "opinion" is meant to constitute the court's judgment. But these Rules compute time, with respect to filing of petitions for rehearing and for issuance of mandate, not from entry of a "judgment" but from the "filing of the opinion of this court." Some difficulty is raised because Rule 27 refuses a rehearing "unless a judge who concurred in the judgment desires it." Also respondent finds it paradoxical to "stay" the court's mandate under Rule 30 when the mandate is customarily issued on the same day the "Order for Mandate" is filed. And respondent argues that the court could not have meant to confer upon its clerk discretion to hold up, for varying lengths of time, the rendering of a judgment until fees have been paid by the prevailing party. In this case the "Order for Mandate" and issuance of the mandate were delayed for twenty-one days, and were not entered within fifteen days from the filing of the opinion which Rule 30 and the court's instructions require; the time has been variously extended in other cases.

fore it, of the clerk who embodies its procedural traditions, as well as in conflict with the assumption of the reviewing court.

But now that the existing practice has revealed abstract disharmonies, if not difficulties, the Circuit Court of Appeals will doubtless establish a more tidy system for meeting the technical requirements for review here. The normal time for entering a judgment, as the starting point for determining whether review will be sought or whether there has been acquiescence in a judgment, should be fixed. The uncertainties inherent in litigation should not be needlessly prolonged. The entry of the "Order for Mandate," which in the Second Circuit begins the running of the period for appeal, is apparently variable and vagrant. In these days of rapid communication, the statutory allowance of three months is more than ample for an unsuccessful litigant to determine whether to seek further review. So long a period ought not to be extended by delay in entering a judgment nor should the burden of securing such entry be put upon the successful litigant. There are bound to be diversities in the modes of rendering and recording judgments of the forty-eight systems of State courts. Uniformity in the entry of judgment among the eleven circuits forming the single federal judicature ought to be capable of achievement without loss to the geographic flexibility of the system.

This brings us to the merits, which involve the validity of an income tax deficiency assessment for 1937. The case is this. The estate of Edward T. Bedford, who died May 21, 1931, included 3,000 shares of cumulative preferred stock (par value $100) of Abercrombie & Fitch Company. Pursuant to a plan of recapitalization respondent, as executor of the estate, in 1937 exchanged those shares for 3,500 shares of cumulative preferred stock (par value $75), 1,500 shares of common stock (par value $1), and $45,240 in cash (on the basis of $15.08 for each of the old preferred shares). The recapitalization had been pro-

posed because the company, after charging against its surplus account stock dividends totaling $844,100, distributed in 1920, 1928, and 1930, had incurred a book deficit in that account of $399,771.87. Because of this deficit, the company, under applicable State law, was unable to pay dividends although for the fiscal year ending January 31, 1937 it had net earnings of $309,073.70.

By comparing the fair market value of the old preferred shares at the date of Bedford's death with the market value of the new stock and cash received the gain to his estate was $139,740. Admittedly the recapitalization was a reorganization, § 112 (g) (1) (D) of the Revenue Act of 1936, 49 Stat. 1648, 1681, 26 U. S. C. § 112 (g) (1) (E), so that only the cash received, but none of the stock, is taxable. Sections 112 (b) (3), 112 (c) (1), 49 Stat. 1648, 1679, 1680, 26 U. S. C. §§ 112 (b) (3), 112 (c) (1). The sole issue is whether the cash, $45,240, is taxable as a dividend, or merely as a capital gain to the extent of 40%. The Tax Court sustained the determination of the Commissioner that the cash was taxable as a dividend, 1 T. C. 478, but was reversed by the Circuit Court of Appeals. 144 F. 2d 272. On a showing of importance to the administration of the Revenue Acts, we granted certiorari. 323 U. S. 707.

The precise question is whether the distribution of cash in this recapitalization "has the effect of the distribution of a taxable dividend" under § 112 (c) (2) of the Revenue Act of 1936 and as such is fully taxable, or is taxable only at the rate of 40% as a capital gain under § 112 (c) (1) of that Act. The relevant provisions read: "(c) *Gain from Exchanges not Solely in Kind.*—(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5) of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such

money and the fair market value of such other property. (2) If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) of this subsection but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property."

The history of this legislation is not illuminating. Section 112 (c) (2) originated in § 203 (d) (2) of the Revenue Act of 1924, 43 Stat. 253, 257. But the reports of the Congressional Committees merely use the language of the section to explain it. H. Rep. No. 179, 68th Cong., 1st Sess., pp. 14–15; S. Rep. No. 398, 68th Cong., 1st Sess., pp. 15–16. Nor does the applicable Treasury Regulation add anything; it repeats substantially the Committee Reports. Treas. Reg. 94, Art. 112 (g)–4. We are thrown back upon the legislative language for ascertaining the meaning which will best accord with the aims of the language, the practical administration of the law and relevant judicial construction.

Although Abercrombie & Fitch showed a book deficit in the surplus account because the earlier stock dividends had been charged against it, the parties agree that for corporate tax purposes at least earnings and profits exceeding the distributed cash had been earned at the time of the recapitalization. That cash therefore came out of earnings and profits and such a distribution would normally be considered a taxable dividend, see § 115 (a),[4] and has so

---

[4] "(a). *Definition of Dividend.*—The term 'dividend' when used in this title (except in section 203 (a) (3) and section 207 (c) (1), relating to insurance companies) means any distribution made by a

been treated by the courts in seemingly similar situations. It has been ruled in a series of cases that where the stock of one corporation was exchanged for the stock of another and cash and then distributed, such distributions out of earnings and profits had the effect of a distribution of a taxable dividend under § 112 (c) (2). *Comm'r* v. *Owens,* 69 F. 2d 597; *Comm'r* v. *Forhan Realty Corp.,* 75 F. 2d 268; *Rose* v. *Little Investment Co.,* 86 F. 2d 50; *Love* v. *Comm'r,* 113 F. 2d 236; *Campbell* v. *United States,* 144 F. 2d 177. The Tax Court has reached the same result, that is, has treated the distribution as a taxable dividend, in the case of the recapitalization of a single corporation. *McCord* v. *Comm'r,* 31 B. T. A. 342, 344; *J. Weingarten, Inc.* v. *Comm'r,* 44 B. T. A. 798, 808–809; *Knapp Monarch Co.* v. *Comm'r,* 1 T. C. 59, 69–70, affirmed on other grounds, 139 F. 2d 863. We cannot distinguish the two situations and find no implication in the statute restricting § 112 (c) (2) to taxation as a dividend only in the case of an exchange of stock and assets of two corporations.

Respondent, however, claims that this distribution more nearly has the effect of a "partial liquidation" as defined in § 115 (i).[5] But the classifications of § 115, which governs "Distributions of Corporations" apart from reorganizations, were adopted for another purpose. They do not apply to a situation arising within § 112. The definition of a "partial liquidation" in § 115 (i) is specifically limited

corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made."

[5] "(i). *Definition of Partial Liquidation.*—As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock."

to use in § 115. To attempt to carry it over to § 112 would distort its purpose. That limitation is not true of § 115 (a) which defines "dividend" for the purpose of the whole title. Accordingly, this definition is infused into § 112 (c) (2). Under § 115 (a) a distribution out of accumulated earnings and profits is a "dividend," thus confirming the conclusion that a distribution of earnings and profits has the "effect of the distribution of a taxable dividend" under § 112 (c) (2).

Recapitalization does not alter the "effect." Although the capital of a company is reduced, the cash received is a distribution of earnings and profits and as such falls within the federal tax. That the company's treatment of its stock dividends may bring consequences under State law requiring a capital reduction does not alter the character of the transactions which bring them within the federal income tax. Recapitalization is one of the forms of reorganization under § 112 (g) (1) (D). It cannot therefore be urged as a reason for taking the transaction out of the requirements of § 112 and forcing it into the mold of § 115. The reduction of capital brings § 112 into operation and does not give immunity from the requirements of § 112 (c) (2).

Treating the matter as a problem of statutory construction for our independent judgment, we hold that a distribution, pursuant to a reorganization, of earnings and profits "has the effect of a distribution of a taxable dividend" within § 112 (c) (2). As is true of other teasing questions of construction raised by technical provisions of Revenue Acts the matter is not wholly free from doubt. But these doubts would have to be stronger than they are to displace the informed views of the Tax Court. And if the case can be reduced to its own particular circumstances rather than turn on a generalizing principle we should feel bound to apply *Dobson* v. *Commissioner*, 320 U. S. 489, and sustain the Tax Court.

*Reversed.*