## LLOYD v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8976.

Circuit Court of Appeals, Third Circuit.

Argued Jan. 11, 1946.

Decided March 4, 1946.

644

Wm. Clarke Mason, of Philadelphia, Pa. (Jesse R. Fillman, W. James MacIntosh, Owen Biddle and ·Caspar W. B. Townsend, all of Philadelphia, Pa., on the brief), for petitioner.

Morton K. Rothschild, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Helen R. Carloss, and Bernard Chertcoff, Sp. Asst. to the Atty. Gen., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN, and O'CONNELL, Circuit Judges.

O'CONNELL, Circuit Judge.

This petition for review of the Tax Court's decision presents a rather narrow question for our consideration. We are required to pass on the correctness of the Commissioner's holding that proceeds from the sale of certain unmatured coupons clipped from tax-exempt municipal bonds (later sold) were includible in taxable income of the seller. The taxpayer contends that the proceeds in question were tax-exempt as being interest upon the obligation of a political subdivision of a State within the meaning of Section 22(b) (4) of the Internal Revenue Code.[1]

Taxpayer is a partner in the banking firm of Drexel & Company of Philadelphia. Drexel & Company joined a Syndicate which entered into. an agreement with the City of Philadelphia in 1941 to act as sole agent in effecting a refunding of its outstanding bonds. The mechanics, briefly summarized, were as follows: the Plan called for the refunding of certain City bond issues aggregating $131,064,000, bearing interest at rates varying from 4 per cent to 4½ per cent and maturing at divers dates from 1952 to 1977 but which were callable at the City's option during the years 1942 to 1947. The City would issue new refunding bonds and exchange them for such old outstanding bonds as might be surrendered. The refinancing would be accomplished solely through the Syndicate which was given the right to charge old bondholders who desired to make the exchange a fee of 1 per cent of the principal amount of each new bond so issued.[2] The Syndicate was also permitted to buy and sell and otherwise deal in both the outstanding and the new refunding bonds for its own account. Because the new bonds provided for interest at different rates,[3] those issued in coupon form[4] had attached to them two types of cou-

1 "Exclusions from gross income. The following items shall not be included in gross income and shall be exempt from taxation under this chapter: * * * (4) Tax-free interest. Interest upon (A) the obligations of a State, Territory, or any political subdivision thereof, * * *." 26 U.S.C. (1940 ed.) Sec. 22(b) (4); 26 U.S.C.A. Int.Rev.Code, § 22(b) (4).

2 The following qualifications to this 1 per cent fee provision were made: (a) City Sinking Fund Commissioners had the option to· make exchanges free from commission payments, and (b) Syndicate members in transmitting bonds for exchange had to pay to the Syndicate a fee of only ½ of 1 per cent of the principal amount.

3 Under the Refunding Plan, the new bonds provided for interest at the rate stipulated in the old bonds until the respective first optional call dates of the old bonds, and for interest at reduced rates varying from 2¼ per cent to 3¼ per cent thereafter.

4 Some of the new refunding bonds were issued by the City in registered form. In the present case no question is raised as to the tax consequences of the dealings in the registered bonds.

pons designated "A" and "B". The A coupons represented interest to be paid during the life of each new bond at the reduced rate provided for in the Plan. The B coupons represented the difference between the new reduced rate of interest and that carried by the old bonds. The B coupons ran from July 1, 1941 until the respective first optional call date of the old bonds.[5] There were two compelling reasons for the use of the two sets of coupons. The first was to provide for a reduction in the interest rate only after the respective first optional call date of the old bonds. The second was to make it possible for bondholders to detach the B coupons and thus have instruments carrying a single rate of interest which would be familiar to investors and which would permit trading the bonds in the market, thereby providing inducement to the old holders to make the exchanges desired by the City.

During 1941 the Syndicate purchased old bonds of the face value of $15,017,400

for $17,159,994.59. These were exchanged for new refunding bonds of the face value of $15,017,400. The new refunding bonds were sold by the Syndicate for $16,517,164.46. But before the new refunding bonds were offered for sale, the B coupons were detached. For convenience in distribution to each of the 39 members of the Syndicate, an arrangement was made with The Philadelphia National Bank so that, at intervals when sufficient detached B coupons were on hand, the Bank would discount them on a 1¼ per cent basis. The Syndicate sold under this arrangement to The Philadelphia National Bank, at a discount, B coupons having a face value of $666,896.65 and received as proceeds of these unmatured coupons $647,630.38. All of these transactions were consummated in 1941. Is this sum to be computed in determining the gain or loss on the sale of the new refunding bonds?[6]

Taxpayer contends that it is tax-exempt "interest" and that, therefore, a net loss

[5] For example, Series Q bonds of the new Refunding Issue matured on January 1, 1970, with first optional call date on January 1, 1958. They were to be exchanged for old outstanding bonds bearing interest of 4¼ per cent and maturing on August 1, 1977, with first optional call date on August 1, 1947. The Series Q bonds had attached thereto 57 A coupons for $16.25 each. Coupon No. 1-A was payable "unless the bond hereinafter mentioned shall have been called for previous redemption" on January 1, 1942, and each succeeding number up to and including No. 57-A was payable "unless the bond hereinafter mentioned shall have been called for previous redemption" at the end of each succeeding six-month period up to and including January 1, 1970. The Series Q bonds also had attached thereto 12 B coupons for $5 each with the printed statement on each coupon saying, "being 6 months' interest then due" and one B coupon for 83 cents with the printed statement thereon saying, "being 1 months' interest then due." Coupon No. 1-B was payable on January 1, 1942, and each succeeding number up to and including No. 12-B was payable at the end of each succeeding six-month period up to and including July 1, 1947. Coupon No. 13-B for 83 cents was payable on August 1, 1947. All coupons, both A and B, were payable to bearer. The bond itself (Series Q) provided in part as follows: "The City of Philadelphia, Pennsylvania, for value received, hereby acknowledges itself indebted and promises to pay on the First day of January, 1970, to bearer, or if this

bond be registered as to principal, then to the registered owner hereof, at the office of The Philadelphia National Bank, Philadelphia, Pennsylvania, the sum of One Thousand Dollars ($1000), and to pay interest thereon at said office from the date hereof to the maturity hereof, unless called for previous redemption, at the rate of three and one-quarter per cent. (3¼%) per annum, upon presentation and surrender of the coupons hereto attached (designated "A coupons") payable semi-annually on the First days of January and July in each year, as they severally mature, and in addition, to pay interest at the rate of one per cent (1%) per annum from the date hereof to August 1, 1947, upon presentation and surrender of the coupons hereto attached (designated "B coupons"), payable semi-annually on the First days of January and July of each year until July 1, 1947, and thereafter on August 1, 1947, as they severally mature. Any or all of the aforesaid B coupons may be detached and negotiated prior to maturity without impairing the negotiability of this bond."

[6] Actually, since the petitioner is an individual taxpayer who was a partner of Drexel & Company, one of the members of the Syndicate, this appeal adjudicates only his deficiency of $3,960.98 for the year 1941 as determined by the Commissioner and sustained by the Tax Court. The issue however depends entirely upon the method of treating these proceeds obtained by the Syndicate and ultimately distributed pro rata to the partners of the members of the Syndicate.

resulted from the entire transaction. The Commissioners maintains that the proceeds of the sale of the unmatured B coupons did not represent "interest", and therefore were not tax-exempt. It is important to note that no contention is made that these proceeds include any money received for accrued interest. We have no evidence fixing the exact period the Syndicate held the coupons or bonds. It is clear that both were held for only a short period of time, at the most less than a year. The Tax Court found, "Almost simultaneously the Syndicate purchased old outstanding bonds, exchanged them for new refunding bonds with A and B coupons attached, detached the B coupons, sold the new refunding bonds with A coupons attached at a loss, and then sold $666,896.65 face value of B coupons at a discount of 1¼ percent and received therefore $647,630.38." And again, "During 1941 the Syndicate sold to the Philadelphia National Bank at a discount B coupons having a face value of $666,896.65 and received from the Philadelphia National Bonk the sum of $647,-630.38. During 1941 the Syndicate also received the face value of B coupons maturing January 1, 1942, in the sum of $15,-314.22."

There is no question here as to the taxability of the face value of the coupons which matured on January 1, 1942. The precise question for our determination is thus whether the Syndicate, which was only an intervening holder of the bonds and unmatured coupons, could claim exemption to the extent of the entire proceeds of the coupon sale at discount to The Philadelphia National Bank. The Tax Court held that these proceeds were nonexempt.

█ Claiming an exemption from a tax, the taxpayer has the burden of satisfying the requirement that the facts fit clearly within the exempting clause of the statute, United States v. Stewart, 1940, 311 U.S. 60, 71, 61 S.Ct. 102, 109, 85 L.Ed. 40: "Yet those who seek an exemption from a tax must rest it on more than a doubt or ambiguity. Bank of Commerce v. [State of] Tennessee, 161 U.S. 134, 146, 16 S.Ct. 456, 460, 40 L.Ed. 645; Id., 163 U.S. 416, 423, 16 S.Ct. 1113, 1116, 41 L.Ed. 211. Exemption from taxation cannot rest upon mere implications. United States Trust Co. v. Helvering, 307 U.S. 57, 60, 59 S.Ct. 692,

693, 83 L.Ed. 1104. As stated by Mr. Justice Cardozo in Trotter v. Tennessee, 290 U.S. 354, 356, 54 S.Ct. 138, 139, 78 L. Ed. 358. 'Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced.' And see Pacific Co. Ltd. v. Johnson, 285 U.S. 480, 491, 52 S.Ct. 424, 426, 76 L.Ed. 893."

██ We do not believe that the taxpayer has met this burden under the circumstances of the case. Opinion appears uniform that the term "interest", in its general usage, means "compensation for the use or forbearance of money", Deputy v. DuPont, 1939, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416; and see Old Colony R. Co. v. Comm., 1931, 284 U.S. 552, 560, 52 S.Ct. 211, 214, 76 L.Ed. 484; where the Supreme Court stated, "And as respects 'interest,' the usual import of the term is the amount which one has contracted to pay for the use of borrowed money."[7] The taxpayer has not proved to the satisfaction of the Tax Court—nor to ours—that the $647,630.38 in question here was paid and received as "compensation for the use of money." That this sum of money was many times greater than the amount of 1941 interest the *obligor* was required to pay on the B coupons supports this conclusion. Moreover, this sum of money was not paid to the Syndicate by the obligor (the City, which was a stranger to the transaction whereby the unmatured coupons were sold to The Philadelphia National Bank). Finally, the Syndicate's money was invested in the City bonds for but an indefinite, short period of time in "an almost simultaneous" operation through which the Syndicate bought and held the new refunding bonds, detached the B coupons and then sold both the bonds and coupons to different purchasers. Obviously, the Syndicate could not have, simultaneously, a return of its capital investment and compensation for the use of such money. Consequently, we cannot conclude logically that the Syndicate received the $647,630.38 as "interest" on the new City bonds.

Rather, we believe the sale of the unmatured coupons to the bank really constituted a bargain of a right to receive certain moneys in the future from the City. Evaluation of this right and, in the last analysis, how much the Syndicate obtained for it, depended upon and was the

---

[7] The books are full of similar definitions of "interest". Among many others, reference may be made to the following: Penn Mutual Life Ins. Co. v. Com'r, 3 Cir., 1937, 92 F.2d 962, 967; Bair v. Snyder County State Bank, 1934, 314 Pa. 85, 90, 171 A. 274; 1 Bouv.Law Dict., Rawles Third Revision, p. 1642.

result of the combination of several factors, including capital investment and some measure of sagacity. Gains thus arising are taxable. Willcuts v. Bunn, 1931, 282 U.S. 216, 227, 228, 51 S.Ct. 125, 75 L.Ed. 304, 71 A.L.R. 1260.

We see no inconsistency in this result with the cases cited as authorities by the taxpayer.[8] Perhaps the only one which really bears on the question before us is Clyde C. Pierce Corporation v. Commissioner, 5 Cir., 1941, 120 F.2d 206, where a securities dealer bought certain defaulted tax exempt bonds with matured coupons attached. The dealer detached the coupons, sold the bonds, and then collected the proceeds of the coupons from the obligor. These proceeds were held computable in determining gain or loss on the purchase and sale of the bonds. The proceeds of the past due coupons were clearly not interest to the taxpayer because they were not compensation for the use of his money. They represented, rather, proceeds resulting from the combination of several factors, including capital investment and very likely, a considerable measure of sagacity. What the Court there stated is here pertinent: "The

fact that the accrued coupons are paid as interest is without significance. The real question, the only one for tax purposes, is what was the gain or loss made on the purchase. This is to be determined by taking into account all receipts on account of the purchased securities, including not only what was received from the sale of the bonds but what was paid by the debtor on account of the accrued interest."[9] Clyde C. Pierce Corporation v. Commissioner, supra, 120 F.2d at page 208. The same reasoning applies here. We must view the bonds and coupons transactions for tax purposes as synthesized: taxpayer purchased certain securities and sold part of each instrument to one purchaser and part to another. To determine what gain or loss was realized from such transactions it is obvious that the proceeds from all the sales must be totaled.

We think the Tax Court's estimate of the situation was correct, whether we treat the problem as one for our independent judgment or as one predetermined under the principle of Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248.[10] Accordingly, the Tax Court's decision is affirmed.

---

[8] We discern no support for the taxpayer's position in any of the authorities cited by him. Helvering v. Horst, 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655, merely held that the bondholder who gave an unmatured bond coupon to his son was taxable for the money collected during the taxable year by the son from the obligor. Hort v. Commissioner, 1941, 313 U.S. 28, 61 S.Ct. 757, 85 L. Ed. 1168, held that a sum of money received by a taxpayer-lessor in cancellation of a lease was taxable as income. That the sum so received was less than the difference between the present value of the unmatured rental payments and the fair rental value of the premises for the remainder of the term was thought to be immaterial. In Gibson v. Commissioner, 2 Cir., 1943, 133 F.2d 308, the taxpayer sold certain stock purchase rights with a market value of $12,255 for $13,728.04. In holding that the sum of $12,255 was taxable as a stock dividend, the Court stated, 133 F.2d at page 309, "An analogy may be found in the sale of an unmatured interest coupon cut from a bond; the proceeds of such a sale would clearly be income. See Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A. L.R. 655. * * *" This dictum rather appears to support the Commissioner's position. Obviously, the question under consideration here was nowhere remotely

involved. None of the other authorities relied upon by the taxpayer illuminates the precise question determined here.

[9] It is interesting to note that in the Pierce case the taxpayer actually received the proceeds from the obligor. Here, the proceeds in question were obtained from some one other than the obligor. The present case is thus a much stronger one for concluding that the proceeds did not constitute interest.

[10] Cf. Kelley Co. v. Commissioner and Talbot Mills v. Commissioner, 66 S.Ct. 299, 304, opinion of the Supreme Court delivered by Mr. Justice Reed on January 7, 1946, dealing with the application of Section 23 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 23, which allows as a deduction, "all interest paid or accrued within the taxable year on indebtedness." In the view of the majority of the Supreme Court, the Tax Court's determinations that certain payments were or were not "interest" are not reviewable: "The Tax Court is fitted to decide whether the annual payments under these corporate obligations are to be classified as interest or dividends. The Tax Court decisions merely declare that the undisputed facts do or do not bring the payments under the definition of interest or dividends. * * * Such situations seem to us to fall within the Dobson rule."