BAZLEY v. COMMISSIONER OF INTERNAL REVENUE.

No. 8947.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 20, 1945.

Reargued March 5, 1946.

Decided April 16, 1946.

MARIS and GOODRICH, Circuit Judges, dissenting.

Henry S. Drinker, Jr., of Philadelphia, Pa. (Frederick E. S. Morrison, Calvin H. Rankin, and Drinker, Biddle & Reath, all of Philadelphia, Pa., on the brief), for petitioner.

Helen Goodner, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Helen R. Carloss, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before BIGGS, MARIS, GOODRICH, McLAUGHLIN, and O'CONNELL, Circuit Judges.

O'CONNELL, Circuit Judge.

This is a petition to review the decision of the Tax Court sustaining an income tax deficiency assessed against J. Robert Bazley.[1]

Mr. and Mrs. J. Robert Bazley owned all but one share of J. Robert Bazley, Inc. As of February 1, 1939, the corporation had accumulated an earned surplus of $855,783.-

---

[1] The Tax Court upheld the Commissioner in assessing deficiencies against both J. Robert Bazley and Alice H. Bazley. By stipulation approved this judgment is controlling in the case of Alice H. Bazley. This case was originally argued before Biggs, McLaughlin and O'Connell, Circuit Judges. An opinion of the court, per O'Connell, Circuit Judge, was filed on January 8, 1946. Petition for reargument was granted. Reargument was had before the court en banc. Opinion of January 8, 1946, has been withdrawn and this supersedes it.

82. On March 16, 1939, the corporation distributed to Mr. and Mrs. Bazley and the one qualifying shareholder in amounts proportionate to their shareholdings, $400,000 in twenty year debenture bonds.[2] A corresponding reduction in earned surplus was made on the books of the corporation. Is this $400,000 in twenty year debenture bonds, callable at the option of the obligor, freely marketable and admittedly worth their face value, taxable as ordinary income to the distributees? The Commissioner assessed a deficiency against the Bazleys for the year 1939 on the ground that the $400,000 in bonds represented taxable income in the hands of the recipients. The Tax Court upheld the Commissioner, concluding that the distribution of the bonds was "essentially equivalent to the distribution of a taxable dividend." Internal Revenue Code, Section 115(g).[3] We are asked to reverse the Tax Court, chiefly on the assertion that the $400,000 in bonds are exempt from taxation because they were distributed in pursuance of a plan of reorganization of J. Robert Bazley, Inc., within the meaning of Section 112 of the Code.

Shortly prior to February 1, 1939, J. Robert Bazley, Inc., was engaged in general heavy contracting business with most of its operations consisting of coal mining by the open-pit method. As previously indicated, the corporation's stock was owned by J. Robert Bazley, Alice H. Bazley, his wife, and Alfred Day, all of whom constituted the board of directors. On February 16, 1939, these three people as owners of the outstanding capital stock of the corporation held a special meeting pursuant to resolutions adopted by themselves as the board of directors on February 6, 1939, and formally approved a proposed plan of reorganization. Resolutions authorizing the necessary corporate action for consummation of this plan were passed. On March 6, 1939, the Commonwealth of Pennsylvania approved the amendments to the company's Articles of Incorporation increasing the authorized common stock.

The reorganization is reflected in the table set forth below which indicates stock ownership and capitalization of the corporation before and after the occurrence of the transaction under scrutiny here.

|  | Old | New | |
| Name | Number of Shares | Number of Shares | Debenture Principal Amount |
| --- | --- | --- | --- |
| J. Robert Bazley | 798 | 3,990 | $319,200.00 |
| Alice H. Bazley | 201 | 1,005 | 80,400.00 |
| Alfred Day | 1 | 5 | 400.00 |
| Total | 1,000 | 5,000 | $400,000.00 |

Capital Structure Of Corporation

February 1, 1939 (Before proposed reorganization)
1,000 shares common stock par value of $100 per share $100,000.00
Earned Surplus .......... 855,783.82

$955,783.82

March 16, 1939 (After reorganization)
Outstanding Debenture Bonds $400,000.00
5,000 shares common stock without nominal or par value, the stated capital applicable to which is.... 300,000.00
Earned Surplus .......... 255,783.82

$955,783.82

On March 16, 1939, the stockholders delivered their 1,000 shares of old common stock to the corporation and received from the corporation the 5,000 shares of the new common stock[4] and debenture bonds in the aggregate principal amount of $400,000. The old common stock was cancelled by the corporation.

Whether a corporation has cancelled its stock at such time and in such manner as to make the distribution and

---

[2] J. Robert Bazley received $319,200 in debenture bonds, Alice H. Bazley, his wife, received $80,400 in debenture bonds, and Alfred Day received $400 in debenture bonds.

[3] 26 U.S.C. (1940 ed.) Sec. 115 (g), 26 U.S.C.A. Int.Rev.Code, § 115 (g).

[4] No attempt was made to tax receipt of the common stock, in whole or in part. Cf. Helvering v. Griffiths, 1943, 318 U. S. 371, 63 S.Ct. 636, 87 L.Ed. 843.

cancellation in whole or in part essentially equivalent to the distribution of a taxable dividend is a question of fact: Brown v. Commissioner, 3 Cir., 1935, 79 F.2d 73; Commissioner v. Champion, 6 Cir., 1935, 78 F.2d 513; Commissioner v. Babson, 7 Cir., 1934, 70 F.2d 304; Randolph v. Commissioner, 8 Cir., 1935, 76 F.2d 472; Hirsch v. Commissioner, 9 Cir., 1941, 124 F.2d 24. Consequently, we are powerless to disturb the Tax Court's determination of such a factual question if substantial evidence to support it exists. Helvering v. Kehoe, 1940, 309 U.S. 277, 60 S.Ct. 549, 84 L.Ed. 751. Nor will we controvert the Tax Court's holding by "treating as questions of law what really are disputes over accounting." Dobson v. Commissioner, 1943, 320 U.S. 489, 499, 64 S.Ct. 239, 245, 88 L. Ed. 248. Indeed, such determinations seem to fall clearly within the Dobson rule. Cf. John Kelley Co. v. Commissioner (Talbot Mills v. Commissioner), 66 S.Ct. 299.

In any event, as we view the record in this case, we believe the Tax Court, applying the correct criterion, reached the correct conclusion. Actually, no "sole decisive" test for the application of Section 115(g)[5] has been laid down: Flanagan v. Helvering, 1940, 73 App.D.C. 46, 116 F.2d 937, per Vinson, J. The history of Section 115(g), beginning with the Act of 1926, throws some light on the desired objective of Congress in passing such legislation. In the House, Senate and Conference Reports[6] an illustration of the type of situa-

tion intended to be covered by this section was given thus: Suppose " * * * the case of two men holding practically the entire stock of a corporation for which each paid $50,000. The corporation having accumulated a surplus of $50,000 above its cash capital, buys from the stockholders for cash one-half the stock held by them and cancels it, and the payment is non-taxable because it is a partial redemption of stock. To change this result and make it taxable [§ 115] (g) was written and incorporated into the law." [7]

■ We see no real distinction between a case where the corporation pays cash for its outstanding stock and where the corporation pays in the form of debenture bonds for its old stock. See Doerschuck v. United States, D.C.E.D.N.Y.,1921, 274 F. 739. In each case the application of Section 115(g) to the transaction under scrutiny depends on the particular facts. McGuire v. Commissioner, 7 Cir., 1936, 84 F.2d 431; certiorari denied, 1936, 299 U. S. 591, 57 S.Ct. 118, 81 L.Ed. 435.

■ Under Section 115(a)[8] a distribution out of accumulated earnings and profits is a "dividend". "Recapitalization does not alter the 'effect'". Commissioner v. Estate of Bedford, 1945, 325 U.S. 283, 292, 65 S.Ct. 1157. The net worth of the corporation, i.e., the value of the stock in the hands of the stockholders, prior to the reorganization, was $955,783.82. This value, after reorganization, was $555,783.82. Clearly, the corporation has thus distribut-

[5] 26 U.S.C. (1940 ed.) Sec. 115(g), 26 U.S.C.A. Int.Rev.Code, § 115 (g).

[6] H.Rep.No.1, 69th Cong., 1st Sess. p. 5; S.Rep.No.52, 69th Cong., 1st Sess. p. 15; H. Conference Rep.No.356, 69th Cong., 1st Sess. p. 30.

As pointed out in f.n. 3 of Flanagan v. Helvering, supra, the illustration was made in connection with the Act of 1926, Sec. 201 (g), 44 Stat. 11, 26 U.S.C.A. Int.Rev.Acts, page 147. In relevant portions this is identical with the corresponding section of the 1939 Revenue Act, 26 U.S.C. (1940 ed.) Sec. 115 (g), 26 U.S.C.A. Int.Rev.Code, § 115 (g).

[7] For an example of the applicability of the illustration to an actual case, see Hyman v. Helvering, 1934, 63 App.D.C. 221, 71 F.2d 342; certiorari denied, 1934,

293 U.S. 570, 55 S.Ct. 100, 79 L.Ed. 669.

[8] 26 U.S.C. (1940 ed.) Sec. 115 (a), 26 U.S.C.A. Int.Rev.Code, § 115 (a): "(a) Definition of dividend. The term 'dividend' when used in this chapter (except in section 203 (a) (3) and section 207 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made."

ed $400,000 out of accumulated earnings and profits. The face and market value of the bonds is admittedly $400,000. By their distribution to the stockholders, the corporation effectively consumed that much of the earned surplus which would otherwise be available for declaration of subsequent dividends. The Bazleys admit this.

To issue bonds, it would not have been necessary to adjust the value of the capital stock ($100,000) on the books of the corporation. Normally, the bonds would have been sold for cash, in which event no charge would have been made against earnings. But had the normal procedure been followed, to transfer the cash into the hands of the stockholders would necessitate a declaration of a dividend with the obvious consequent tax to the recipient. Such dividend would be a charge against earnings. Consider what was accomplished here. The same results were obtained. Instead of the stockholders paying cash into the treasury of the corporation and subsequently receiving an equivalent amount back, the bonds were distributed directly to the stockholders on the same basis as if declared as a dividend. But to accomplish the actual transfer of the bonds to the stockholders without technically declaring a dividend, the plan of cancelling the old stock was adopted. This distribution by the corporation of other property (the bonds) out of its earnings and accumulated profits as a result of the cancellation of its old stock thus occurred at such time and in such manner as to make the distribution and cancellation essentially equivalent to the distribution of a taxable dividend.

In connection with the application of Section 115(g) to this transaction, we need not inquire into motive. The "basic criterion" is the net effect of the distribution rather than the motives and plans of the taxpayer or his corporation. Smith v. United States, 3 Cir., 1941, 121 F.2d 692. Here, as pointed out above, the net effect of the distribution of the debenture bonds was to distribute to the petitioner a substantial segment of the previous earnings of the corporation. Cf. Commissioner v. Estate of Bedford, supra.[9]

The Tax Court's factual conclusion that this was a distribution out of earnings and profits, essentially equivalent to the distribution of a taxable dividend, disposes of the petitioner's contention that at the most he is taxable only at the capital gains rate. Sections 117, 112(b)(2) and 112(c)(1).[10] These sections must be read and applied in conjunction with Section 115[11] which governs distributions and defines "dividend" as "any distribution made by a

---

[9] In the Bedford case, there was a bona fide "recapitalization-reorganization" which was effective to make tax-free the receipt of stock by the taxpayer under 26 U.S.C. (1940 ed.), Sec. 112 (b) (3), Sec. 112 (c) (1), 26 U.S.C.A. Int.Rev.Code, § 112 (b) (3), Sec. 112 (c) (1). Obviously, this case is a much stronger one for imposing a tax than the "seemingly similar situation" where two corporations are involved and where the net effect is to transfer earnings of one corporation to another and then to distribute out of the second corporation's assets. In that type of case, "Where one corporation acquired the assets of another corporation in a tax-free reorganization it is well settled that the earned surplus of the transferor becomes earned surplus of the transferee and is subject to taxation as a dividend on subsequent distribution to the stockholders of the transferee." Putnam v. United States, 1 Cir., 1945, 149 F.2d 721, 726, applying the doctrine of Commissioner v. Sansome, 2 Cir., 1932, 60 F. 2d 931, certiorari denied Sansome v. Burnet, 1932, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575, which we followed in Corrigan v. Commissioner, 3 Cir., 1939, 103 F.2d 1010, certiorari denied 1939, 308 U.S. 576, 60 S.Ct. 91, 84 L.Ed. 482. For other cases in the long line following the Sansome decision, see f.n. 5 to Putnam v. United States, supra, 149 F.2d at page 726.

Furthermore, in determining whether there has been a "distribution of a taxable dividend", it is immaterial whether the distribution occurs after an exchange of stock and assets of two corporations as in Commissioner v. Sansome, supra, or whether the assets of one corporation only are involved. See Commissioner v. Estate of Bedford, supra 325 U.S. at page 291, 65 S.Ct. 1157.

[10] 26 U.S.C. (1940 ed.) Sec. 117, 112 (b) (2) and (c) (1), 26 U.S.C.A. Int. Rev.Code, §§ 117, 112 (b) (2) and 112 (c) (1).

[11] 26 U.S.C. (1940 ed.) Sec. 115, 26 U. S.C.A. Int.Rev.Code, § 115.

corporation to its shareholders, whether in money or other property * * * out of its earnings or profits accumulated after February 28, 1913, or * * * out of the earnings or profits of the taxable year * * *." Section 112 may not be used as a device for evading taxes Congress intended to impose. Commissioner v. Fisher, 66 S.Ct. 686.

■ But, it is argued on behalf of the taxpayer that no tax whatsoever may be imposed on the $400,000 in bonds because they were received pursuant to a plan of reorganization of. J. Robert Bazley, Inc. Admittedly, there was a "recapitalization" of J. Robert Bazley, Inc., in the corporate accounting sense. That, however, would not result in a tax exemption. It takes more than a mere literal matching of corporate actions with the words of Section 112 to qualify for tax freedom under the reorganization provisions of the Code. See Commissioner v. Gilmore's Estate, 3 Cir., 1942, 130 F.2d 791, 794. Reference to legislative history reveals that ten years' experience with the exchange and reorganization provisions of the Code led to a strong Congressional movement to excise them completely from the Revenue Act of 1934. They were retained in substantially their present form in reliance upon the prior practice of the courts to "interpret" their provisions so as to prevent escape from taxation in situations where Congress meant to grant no such exemption.[12] In

the view of the then Chairman of the House Ways and Means Committee, the reorganization sections were retained in the Code so that "legitimate reorganizations, required in order to strengthen the financial condition of the corporation will be permitted".[13] Since 1934, administrative interpretation of the reorganization section has limited its benefits to readjustments "as are required by business exigencies" and which are "undertaken for reasons germane to the continuance of the business of a corporation a party to the reorganization."[14] Added sanction is given to the administrative interpretation by the re-enactment of the statute without disapproval of the regulations thereunder. United States v. Dakota-Montana Oil Co., 1933, 288 U.S. 459, 466, 53 S.Ct. 435, 77 L.Ed. 893; Helvering v. Winmill, 1938, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52; Helvering v. Griffiths, 1943, 318 U.S. 371, 395, 396, 63 S.Ct. 636, 87 L.Ed. 843; Commissioner v. Wheeler, 1945, 324 U.S. 542, 547, f.n. 10, 65 S.Ct. 799.

■ The Tax Court found nothing in the calling in of old common stock, issuance and distribution of new common stock, issuance and distribution of $400,000 in bonds which was required to strengthen the financial condition of the corporation. In considering the readjustments brought about by the so-called reorganization, it did not conclude that this one was required by business exigencies or was undertaken

---

[12] During the debate on the 1934 Revenue Act, the entire question of the retention of the reorganization sections of the Act was under serious consideration. On December 4, 1933, a subcommittee of the House Ways and Means Committee proposed the abolition of the exchange and reorganization provisions of Section 112. This was rejected. In its final form, the Revenue Act of 1934 contained what are substantially the same provisions of the present Act.

In the Report accompanying the submission of the Revenue Act of 1934 (H. R.No.704, 73d Cong., Second Session), Chairman Doughton of the Committee stated, "The reorganization provisions have been in effect for many years, having been adopted in substantially their present form in 1924. They state in detail how each step of a reorganization should be treated for tax purposes. The

policy was adopted of permitting reorganizations to take a wide variety of forms, without income-tax liability. As a result, astute lawyers frequently attempted, especially during the prosperous years, to take advantage of these provisions by arranging in the technical form of a reorganization, within the statutory definition, what were really sales. A number of these cases have been carried to the courts, with results on the whole favorable to the Government. The courts have shown a commendable tendency to look through the mere form of the transaction into its substance."

[13] See Report of Chairman Doughton of the House Ways and Means Committee, supra, f.n. 12.

[14] Treasury Regulations 86, under Revenue Act of 1934, Arts. 112 (g) 1, 2. These have remained unchanged with the passage of succeeding revenue acts.

for reasons germane to the continuance of J. Robert Bazley, Inc. It did find that, "There was no legitimate purpose of the corporate business of J. Robert Bazley, Inc., in the issuance and distribution to the stockholders of $400,000 in debenture bonds." To be sure, the Bazleys advanced a number of reasons which, they said, motivated the financial transaction as a result of which they obtained the bonds.[15] None of these in which the Tax Court put credence, however, were even remotely required by "business exigencies" or were "germane to the continuance" of J. Robert Bazley, Inc. To reverse the Tax Court in this case, we would have to hold the Treasury Regulations invalid. There is nothing unreasonable about the regulation. It is a valid exercise of the rule making power. Commissioner v. Wheeler, supra.

Indeed, even prior to the 1934 Act and the Regulations thereunder, the Second Circuit demonstrated that literal compliance with the reorganization sections of the Code is insufficient to qualify for freedom from taxation if a particular situation would otherwise have called for a tax. Helvering v. Gregory, 2 Cir., March 19, 1934, 69 F.2d 809, interpreting Section 112 of the Revenue Act of 1928, 26 U.S.C.A. Int.Rev.Acts, page 377. Judge Learned Hand there considered the actions taken by the corporation and the shareholders in effecting a literal reorganization by forming a new corporation to which certain property was transferred and ultimately distributed to the taxpayer. He remarked, at page 811 of 69 F.2d, "All these steps were real, and their only defect was that they were not what the statute means by a 'reorganization,' because the transactions were no part of the conduct of the business of either or both companies; so viewed they were a sham, though all the proceedings had their usual effect." See Gregory v. Helvering, 1935, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355. So, too, in the present case, the Tax Court has found that there was in fact no legitimate purpose of the corporate business of J. Robert Bazley, Inc., in the issuance and distribution to the stockholders of $400,000 in debenture bonds. Considering actions and results, as we must in the doubtful realm of reorganizational exemptions,[16] we have already demonstrated that $400,000 was siphoned out of accumulated corporate earnings and distributed to the Bazleys and the lone qualifying shareholder in the form of debenture bonds. Congress obviously did not intend to grant a tax exemption in such a situation merely because, qua corporate accounting, there was a "recapitalization" and thus a "reor-

---

[15] They claimed the following reasons motivated the "reorganization": (1) the stockholders, by obtaining debenture bonds for their stock, would receive a more readily marketable and less fluctuating security in case it would become necessary for the estate of a deceased shareholder to liquidate his investment to meet inheritance taxes or for other purposes; (2) the bonds could be sold without reducing the Bazley family's stock control of the corporation; (3) the contemplated entry into the hazardous business of road construction made it desirable for stockholders to possess bonds in order to be in a position at least equal to general creditors in the event of insolvency; (4) the value of the corporation's plant and equipment ($719,-782.41 as of April 30, 1939) was large as compared with its capitalization of $100,000, and since such equipment had been purchased by using funds acquired through accumulation of $855,783.07 of earnings and profits, it was deemed advisable to reflect a dedication of these earnings to corporate use by reducing surplus available for dividends and transferring a part thereof to capital stock and a part to long-term debt represented by the 20-year bonds. Two additional motives advanced by the petitioner as reasons for the questioned transaction were (a) to provide stock of a type available for sale to the company's key employees and (b) to reduce the company's taxable income by $24,000 through the interest payments on the debenture bonds. The majority of the Tax Court refused to accept these two purposes as having existed in fact and, on the whole record, concluded that no legitimate corporate business purpose existed for the recapitalization.

[16] One claiming an exemption from a tax has the burden of sustaining his claim and the tendency is to disallow the claim where doubts are nicely balanced. See Trotter v. State of Tennessee, 1933, 290 U.S. 354, 356, 54 S.Ct. 138, 78 L.Ed. 358; cf. Lloyd v. Commissioner. 3 Cir., 154 F.2d 643.

ganization." Cf. Commissioner v. Wheeler, supra. Clearly, a reversal of the Tax Court's holding would permit the use of the Section 112 exemption as a device for evading taxes Congress intended to impose under Section 115. Cf. Commissioner v. Fisher, supra. In its last analysis, the "recapitalization-reorganization" here under consideration accomplished nothing other than a distribution to the Bazleys and Day which consumed a large portion of the corporation's earned surplus otherwise available for the subsequent declaration of dividends. This result was one which, whatever the motives of the Bazleys may have been, cannot have the effect desired by the recipients of freedom from tax liability. For tax purposes, it stands as any other distribution under Section 115. The distributees must therefore pay income taxes on the bonds received to the extent of their face value.

Affirmed.

MARIS and GOODRICH, Circuit Judges (dissenting).

The critical question in this case is, we think, one of law and one upon which this Court has an obligation to exercise its own judgment when the decision of the Tax Court is brought here for review. That question is whether a corporate reorganization, in order to be tax free, must be one conducted for a "corporate business purpose" of the corporation as distinguished from serving a proper business interest of the shareholders.

That this question is squarely presented there can be no doubt. The Tax Court's findings of fact with regard to the reasons for the transaction here in question are as follows: "Reasons for adopting the transaction hereinafter described, involving the issuance of additional common stock and of debenture bonds, were that the original shareholders, by obtaining debenture bonds for their stockholdings, would receive a security which was much less fluctuating and more readily marketable, particularly in case it was necessary for a deceased shareholder's estate to liquidate his investment in the corporation in order to meet inheritance taxes or for other purposes, and

that if it became necessary to sell some portion of their investment in the corporation the debenture bonds could be sold without reducing the Bazley family stock control of the corporation; that the contemplated entry into the hazardous road building business made it desirable to put the original stockholders in possession of bonds which would place them in a position of sharing alike with creditors to the extent of the debentures instead of ranking after creditors if the business did not succeed; that as of February, 1939 the corporation had plant and equipment of a value ($719,782.41 as of April 30, 1939) which was large in relation to the $100,000 par value of the capital stock outstanding, and, since the equipment had been purchased by the use of funds acquired through the accumulation of $855,783.07 of earnings and profits after the organization of the business in 1930, it was thought advisable to reflect a more permanent dedication to corporate use of these earnings by reducing the surplus available for dividends and transferring a portion thereof to the capital stock account and another portion to the long term debt represented by 20-year debenture bonds."

An additional finding of fact is made as to the relation of the purpose and the corporate business. It reads as follows: "There was no legitimate purpose of the corporate business of J. Robert Bazley, Inc., in the issuance and distribution to the stockholders of $400,000 in debenture bonds."

The significance of these findings of fact is pointed up by the discussion of the Tax Court when it says: "Such objectives as to create a security more desirable for the stockholders as being less fluctuating in value, more regular and certain in its income, easier to market for inheritance tax payments, and furnishing greater safety against claims of corporate creditors are easily understandable from the standpoint of the stockholders. They furnish persuasive reasons why the stockholders wanted to change the form of their investment. But, as we have said, a desire to encompass such an exchange without occasioning the tax consequences usually attendant upon those transactions would not supply the

necessary purpose as a business or corporate object."

We accept the Tax Court's findings of fact. We also, now that we understand we are so to do, accept its conclusion when it applies its facts to a correct rule of law regardless of whether we, in a particular instance, would have reached the same conclusion or not. But if we believe the legal criterion used by the Tax Court is incorrect it is our duty so to say and to send the case back for appropriate proceedings under the application of what we deem the correct criterion.

We think that the criterion here making a distinction between "corporate" and "shareholder" purpose is incorrect. The foundation for it is supposed to be Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355. That case involved the formation of a dummy corporation which did no business otherwise than to participate in a transfer which the taxpayer was seeking to effect without tax liability. What we had was a sale masquerading as a reorganization. The court struck through the sham.

To expand that decision into a rule of law such as is now contended for is to push it beyond anything which we think the court could have had in mind. Nor do we think the expansion is one which a reasonable growth beyond Gregory v. Helvering would call for. We have long since passed the place in our thinking where we view the corporation as "an artificial being, invisible, intangible and existing only in contemplation of law." We think of it as a device that shareholders use to carry on their business as a group. A corporation does not have purposes apart from its shareholders. Shareholders, of course, may have conflicting interests among themselves with regard to the conduct of their common enterprise. They may fight with each other, perhaps, in order to elect A instead of B to the directorship of their company. And, of course, aside from their interest in the common enterprise, called their corporation, they have interests as varied as the hopes and desires of human beings. But when we talk about the interest of shareholders in connection with the business enterprise and have a finding of fact that such and such a thing was done and that it was to the shareholders' business advantage, speaking of them as a group, we do not find substance in a distinction between the business advantages of the shareholders with respect to the corporation or the business advantages of the corporation itself.

Furthermore, this very thing concerned with here, reorganization, is a matter in which shareholders directly participate. The day to day business of the corporation is done by its officers, directors, employees. But a realignment of the interests in the enterprise through reorganization must come, under every corporation law we know of, through vote of the shareholders. In such circumstances it is as a practical matter impossible to separate as to the very transaction involved, a "shareholder's" from a "corporate" interest.

We think the distinction attempted coming, as it does, quite a number of years after Gregory v. Helvering, is one not established by that decision, the statute, nor the regulations. If reorganization provisions contain too many avenues of escape for taxes which ought to be collected the Congress can close those avenues by appropriate legislation which can be so framed and defined as to leave the way clear to what it deems are business transactions in which no gain or loss should be recognized. We do not think it should be by judicial decision which establishes the exceedingly vague criterion as to whether a given transaction was to the interest of the shareholder as distinguished from the interest of the corporation in which he holds shares of stock.

The gloss here sought to be placed upon those provisions of Section 112 of the Internal Revenue Code which render non-taxable the exchange of certain securities in connection with corporate reorganizations, can only be justified upon the assumption that all reorganizations which are put through by stockholders solely to promote their own business purposes must necessarily involve the motive of tax avoidance. Only upon this assumption can the principle of Gregory v. Helvering be applicable. But this assumption is quite unsound as the facts of the case before us demonstrate.

And even clearer cases can readily be brought to mind. Suppose a case in which the common shareholders arrange for the reclassification of a part of their holdings as non-voting stock in order that they may sell it or give it away without endangering their voting control. This would be a perfectly proper business purpose of the stockholders involving not a trace of tax avoidance but it would not benefit the business of the corporation as such. We do not think that there is any authority for the proposition that such a recapitalization would not be within both the letter and the spirit of Section 112.