## AMERICAN GAS & ELECTRIC CO. v. UNITED STATES.

District Court, S. D. New York.
Dec. 11, 1946.

Simpson, Thacher & Bartlett, of New York City (Louis Connick, Courtland Kelsey and Leslie M. Rapp, all of New York City, of counsel), for plaintiff.

John F. X. McGohey, U. S. Atty., of New York City (Henry L. Glenn, Asst. U. S. Atty., of New York City, of counsel), for defendant.

CAFFEY, District Judge.

This is an action to recover the sum of $29,258.20, alleged to have been erroneously exacted from plaintiff, under Section 1802 (a) of the Internal Revenue Code, Title 26 U.S.C.A. as a documentary stamp tax upon a certain issue of stock by plaintiff. Each party moves, upon the amended pleadings and a stipulation of facts, for a judgment in its favor. Thus, only a question of law is involved.

Plaintiff was organized in 1925 under the laws of the State of New York as the result of its consolidation with Appalachian Securities Corporation. Its authorized capital stock consisted of 600,000 shares of $6 Cumulative Preferred Stock and 8,000,000 shares of Common Stock, both of no par value. In January, 1940, 355,623 shares of the Preferred Stock and 4,482,737 and 31/50 shares of the Common Stock were outstanding.

In January, 1940, $30,000,000, principal amount, of Gold Debentures, 5% Series due 2028, callable at 106, plus accrued interest, were also outstanding. These, however, are not of any significance in connection with the question here involved.

The certificate of consolidation provided that the Preferred Stock might be redeemed, in whole or in part, at any time, at $110 per share, plus the amount, if any, by which $6 per annum upon each share to the date of redemption should exceed the dividends actually paid or declared thereon to the date of redemption. In addition to providing for preferential, cumulative dividends at the rate of $6 per share per annum, it provided for preference in any distribution of assets, other than by dividend, from surplus or profits to the extent of $100 per share, plus accrued and unpaid dividends.

The certificate of consolidation also contained the provision required by Section 12 of the New York Stock Corporation Law, Consol.Laws, c. 59, viz.: "The capital of the corporation shall be at least equal to the sum of the aggregate par value of all issued shares having par value, plus the aggregate amount of consideration received by the corporation for the issuance of shares without par value, plus such amounts as, from time to time, by resolution of the board of directors, may be transferred thereto."

The entries in the Preferred Stock capital account on plaintiff's books show that in 1925 it had issued 168,360.5 shares at a value of $100 per share and that from 1925 to 1927 it had issued an additional 228,225 and 44/90 shares at value ranging from $81 to $90 per share, making a total of 396,-585 and 89/90 shares issued against a total value of $37,278,851.25. They also show that it had re-acquired 26 and 89/90 fractional shares in connection with exchanges for stock of the Appalachian company at an average cost of approximately $92 per share, and that it had also re-acquired 40,-936 shares at an average cost of approximately $87 per share, making a total of 40,962 and 89/90 shares re-acquired.

To adjust the book value of the 40,936 shares re-acquired to the average amount, viz., $94 per share, received for the shares issued, plaintiff transferred approximately $7 per share, or $287,451.91 from its capital surplus account to the Preferred Stock capital account. The cost of all the re-

acquired shares, plus this $287, 451.91, viz., a total of $3,850,466.11, was charged to the Preferred Stock capital account, so that in January, 1940, this account showed 355,623 shares outstanding with a book value of $33,428,385.14, or a value of $93.9995 per share.

At different dates plaintiff paid a total of $19,637.84 as stamp taxes on the issuance of its Preferred Stock.

Plaintiff's books also show a capital surplus in January, 1940, of $1,123,762 and an earned surplus of $43,585,325.

In December, 1939, plaintiff's Board of Directors approved a plan of refinancing for the company which was carried out in January, 1940. So far as material here, this plan provided (1) for the re-classification of all its shares, so that the total number of authorized shares would be 8,197,311, consisting of 600,000 shares of 4 3/4% Cumulative Preferred Stock, of the par value of $100 each, and 7,597,311 shares of Common Stock, of the par value of $10 each, (2) for the elimination from its capital structure of all the existing Preferred Stock, (3) for the redemption of all its outstanding Preferred Stock at $110 per share, plus accrued dividends, (4) for the issuance of 355,623 shares of the new Preferred Stock after the redemption of the old stock, (5) for the offering, prior to such redemption, to its existing Preferred stockholders of the privilege of exchanging their stock, share for share, for such 355,-623 new shares, plus $5 in cash per share and a further small amount per share, representing the adjustment of dividends on the old and the new stock, and (6) for the sale of such new Preferred Stock as should not be taken under the exchange offer, at $105 per share, plus accrued dividend from January 1, 1940, through a syndicate of underwriters.

The new Preferred Stock was not redeemable but was preferred upon voluntary liquidation at $110 per share, plus accrued dividends, or, if a majority so approved or in the event of involuntary liquidation, at $100, plus accrued dividends. It also had much more extensive voting privileges and rights, as to election of directors, etc., than the old Preferred Stock.

Portions of the plan relating to the Common Stock and the Debentures are omitted as being of no importance here.

To carry out the plan, on January 7, 1940, plaintiff mailed a letter to its preferred stockholders enclosing a prospectus as to its new Preferred Stock, advising them that, at or before issuing the new stock, it intended to call for redemption the presently outstanding Preferred Stock, offering them the privilege, until 3 p.m. on January 10, 1940, of exchanging their stock for the new stock on the basis above stated, advising them that the new stock was being offered at $105 per share, plus accrued dividend from January 1st, and instructing them, if they desired to make the exchange, to deliver their stock to the Guaranty Trust Company, as plaintiff's agent for that purpose.

Holders of 316,461 shares of the old Preferred Stock accepted this offer of exchange and delivered their certificates to the Trust Company and on January 12th 316,461 shares of the new stock were issued to them, each certificate being for exactly the same number of shares and in the same denominations as the old certificates surrendered. The balance of 39,162 shares of the new Preferred Stock was issued and sold to the underwriters at $105 per share.

On January 12th plaintiff mailed another letter to its preferred stockholders notifying them that on February 13, 1940, it would redeem all its presently outstanding Preferred Stock at $110 per share, plus 20 cents accrued dividend from February 1st, February 1st being the regular dividend date, upon surrender of their certificates to the Guaranty Trust Company with whom the money had been deposited. The letter also said that it should be disregarded by these holders of Preferred Stock who had met the terms of the exchange offer previously made by the company.

On January 12th plaintiff delivered two letters to the Guaranty Trust Company, one appointing it plaintiff's agent to receive the certificates of old Preferred Stock surrendered for exchange and to carry out the details of the exchanges, the other appointing it the depositary of the redemption price of the Preferred Stock and to carry

out the details of the redemption. A check for the full amount necessary to redeem all the Preferred Stock was enclosed in the latter letter and a check for the amount of cash adjustments to which those who surrendered their stock would be entitled was enclosed in the first letter. Later in the same day plaintiff filed with the Secretary of State of New York amendments to its certificate of consolidation incorporating the changes in its corporate structure required by the plan of refinancing.

The premium paid in connection with the redemption of the old stock, viz.: $5,690,-144.86, which represented the difference of $16.0005 between the average value of the 355,623 shares outstanding, as shown in the Preferred Stock capital account, viz., $93.-9995, and the redemption price of $110, plus accrued dividends, was charged, $1,123,761.-61 to capital surplus, thus wiping out the balance in that account as of January 12th, and $4,566,383.25 to earned surplus. The premium received upon the sale of the new Preferred Stock, less expenses of the issue, was credited to capital surplus.

The capital stock liability, after carrying out the plan, as shown on plaintiff's books, was $35,562,300 with respect to the 355,623 shares of new Preferred Stock. The increase of $2,133,914.86 between the capital stock liability on January 12th with respect to the old stock, viz.: $33,428,-385.14, and this amount was effected by transferring from earned surplus $1,898,-923.38, representing the 316,461 old shares exchanged for new shares multiplied by $6.0005, the difference between $100, the par value of the new shares, and $93.9995, the book value, or capital stock liability, of the old shares, and by adding $3,916,200, the par value of the 39,162 new shares sold to the underwriters for cash, less $3,-681,208.52, the capital stock liability with reference to the old 39,162 shares at the average of $93.9995 per share.

On January 12th plaintiff paid the U. S. Collector of Internal Revenue for the Second District of New York $35,562.30 for documentary tax stamps, claimed to be due as a tax, at the rate of 10 cents per share, on the entire issue of 355,623 shares of new Preferred Stock of $100 par value,

and affixed them to the stock books and cancelled them. On November 23, 1943, plaintiff filed with the Collector a claim for the refund of $29,258.20 of the $35,-562.30 so paid. The claim was rejected in full on June 10, 1944.

The claim was predicated upon the theory that the only tax payable with respect to the issuance of the 316,461 shares in exchange for the same number of old shares was a tax of $2,387.90 only, upon the amount of the increase in capital resulting from the transfer from surplus to capital of $6.0005 per share, or the aforesaid $1,898,923.38, and not the tax of $31,-646.10 which was collected upon the entire capital stock issue of 316,461 shares. No claim was made that the tax of $3,-916.20 collected upon the 39,162 shares issued and sold to the underwriters was not legally exacted, nor is any such claim made now. Attached to the claim was an elaborate schedule, showing the number of shares in each certificate issued, viz.: 1, 5, 6, 10, 25, 100, etc., the number of certificates issued for each such number of shares, the tax actually paid on each certificate, based upon a par value of $100 per share for each share in the certificate, the tax which should have been paid on each certificate, based upon a value of $6.0005 per share for each share in the certificate, the amount of over-payment on each certificate, and by multiplying the amount of over-payment on each certificate by the number of certificates issued for that number of shares, the total amount of over-payment on the total number of certificates issued for that number of shares was arrived at. In this manner the total amount of the alleged over-payment of $29,258.20 on all certificates issued was determined.

The applicable statutes in effect on January 12, 1940, were Sections 1800 and 1802(a) of the Internal Revenue Code, Title 26, U.S.C.A. They provided:

"Section 1800. Imposition of tax. There shall be levied, collected, and paid, for and in respect of the several * * * certificates of stock * * * mentioned and described in sections 1801 to 1807, inclusive, or for or in respect of the vellum,

parchment, or paper upon which such instruments, * * * or any of them, are written or printed, the several taxes specified in such sections. * * *

"§ 1802. Capital stock (and similar interests) (a) Original issue. On each original issue, whether on organization or reorganization, of shares or certificates of stock, * * * by any corporation * * * on each $100 of par or face value or fraction thereof of the certificates issued by such corporation * * * 10 cents * * *: * * * Provided, that where such shares or certificates are issued without par or face value, the tax shall be 10 cents * * * per share * * * unless the actual value is in excess of $100 per share; in which case the tax shall be 10 cents * * * on each $100 of actual value or fraction thereof of such certificates * * *, or unless the actual value is less than $100 per share, in which case the tax shall be 2 cents * * * on each $20 of actual value, or fraction thereof, of such certificates. * * *. The stamps representing the tax imposed by this subsection shall be attached to the stock books or corresponding records of the organization and not to the certificates issued."

◼ This tax is a tax on the document, the certificate of stock, and not on the transaction. It is laid, not on each certificate or on each issue of certificates, but on each original issue of certificates. Edwards v. Wabash R. Co., 2 Cir., 264 F. 610, 614, 615. The tax is not a tax on the capital, i. e., the assets received by the corporation upon the original issuance of the certificates. Nor is it a tax upon the amount, if any, transferred from surplus to capital. It is a tax upon the document and not upon the property which it describes. Empire Trust Co. v. Hoey, 2 Cir., 103 F.2d 430, 432.

◼ It is a tax upon the execution and first issuance of the certificates of stock, measured by the par value of all the shares in each certificate, in cases of par value stock, or by the actual value of all the shares in each certificate in cases of no-par value stock. It is a tax upon the certificate and not upon the share. Commercial Credit Co. v. Tait, D.C.D.Md., 2 F.2d

862, affirmed 4 Cir. on opinion below in 7 F.2d 1022. Cf. W. T. Grant Co. v. Duggan, 2 Cir., 94 F.2d 859.

This is also in accord with Internal Revenue Regulations 71, revised July, 1932, issued under the Revenue Act of 1926, as amended by the Acts of 1928 and 1932, which were in force on January 12, 1940. As to computation of the tax, in Article 27 they provided as follows:

"(a) The tax is computed upon the par or face value of the stock, if the shares or certificates have a par or face value, as set forth in the articles of incorporation or agreement, whether or not such par or face value appears on the face of the certificate.

"(b) Where a certificate represents more than one share (however large the number of shares), the par or face value of the certificate in the case of a certificate issued with par or face value, or the actual value of the certificate in the case of a certificate issued without par or face value, is the measure of the tax and not the par or face value or actual value of each separate share which the certificate represents. * * *

"(c) The tax, on original issue, is measured not by the amount paid in, on, or for the stock, but by the par or face value in the case of stock having a par or face value, and by the actual value in the case of stock without par or face value."

There were similar provisions, though not couched in the same language, in all the prior Regulations.

◼ When a corporation issues two or more shares of the same kind of stock, in exchange for one old share, i. e., splits up its stock, the shares issued in exchange are not taxable as an original issue. American Laundry Machinery Co. v. Dean, D.C., S.D.Ohio, 292 F. 620, Trumbull Steel Co. v. Routzahn, D.C., N.D.Ohio, 292 F. 1009, Standard Mfg. Co. v. Heiner, D.C., W.D. Pa., 300 F. 252 and United States v. Pure Oil Co., 7 Cir., 135 F.2d 578.

◼ Nor, when a corporation issues shares of common stock in exchange for preferred stock, or vice versa, or shares of no par value stock in exchange for

shares with a par value, or vice versa, are the shares issued in exchange taxable as an original issue, whether or not the new stock carries different or greater rights and privileges than the old. Edwards v. Wabash R. Co., supra. In re Grant-Lees Gear Co., D.C., N.D.Ohio, 1 F.2d 393, Cleveland Provision Co. v. Weiss, D.C., N.D.Ohio, 4 F.2d 408, and Cuba R. Co. v. United States, 60 Ct.Cl. 272.

In none of the foregoing instances did the stockholders contribute any additional capital to the corporation nor was there any transfer of surplus to capital account. Where additional capital is contributed, the stock issued therefor is unquestionably taxable as an original issue. So also, a corporation may transfer part of its surplus, or accumulated undivided profits, to its capital account without incurring taxable liability but, if it issues stock in connection therewith, or subsequently, the stock is taxable as an original issue.

A familiar example is the issuance of a stock dividend. That is payable out of surplus or accumulated undivided profits, and, in order to make the adjustment, the amount of the dividend is transferred from surplus to capital account on the books. Eisner v. Macomber, 252 U.S. 189, 209, 210, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570. In Ohio State Life Ins. Co. v. Busey, D. C., S.D.Ohio, 56 F.Supp. 410, stock issued in payment of a stock dividend was held to be taxable as an original issue.

Plaintiff admits that the 39,162 new shares issued and sold to the underwriters were properly taxed as an original issue. They represented a contribution of new capital. It also admits that some tax was payable on account of the 316,461 new shares issued in connection with the transfer of $1,898,923.38 from earned surplus to capital account, but relying upon United States v. Pure Oil Co., supra, and Cleveland Provision Co. v. Weiss, supra, it contends that the tax should have been imposed only to the extent that there was a dedication of additional capital, i. e., only to the extent of $1,898,923.38. And, in computing the tax which it says it should have paid, it has calculated the amount upon the frac-

tional portion of each share, viz., $6.0005, representing that share's proportionate amount of the surplus transferred to capital account. In so doing, contrary to the Regulations, it is really measuring the tax by the amount of capital added.

The question was not involved in the Cleveland Provision case. There the question was whether no-par value stock issued in exchange for par value stock was an original issue. By way of dictum at the end of its opinion (4 F.2d left column, page 412), the court said: "If the corporation had received or exacted additional contributions to its capital on issuing its no-par value shares, it might be that to this extent this would be an original issue. It might be that, if the corporation had carried to its capital account some part of its surplus, this would, to that extent, be a stock dividend and an original issue. No opinion need be expressed one way or the other."

In the Pure Oil case the company had issued two classes of preferred stock on which there were large unpaid accumulated dividends. Desiring to reduce the dividend rate, it issued new preferred stock, bearing a lower dividend, in exchange for the old preferred stock, share for share, and also issued at par such new preferred stock in satisfaction of the unpaid dividends. The Government sought to collect a tax on the total amount of new stock issued, claiming that it was all an original issue. It argued that the entries upon the corporate books failed to disclose any shares specifically designated as a substitution for the old certificates and that, inasmuch as no shares were issued in lieu of any certain specified shares and no specific certificates charged against capital or surplus, it was impossible to classify the entire new issue as other than an original issue. But the court held that it was quite feasible to allocate 264,226 new shares as having been issued in exchange for the old shares and 56,115 new shares as having been issued in payment of the accrued dividends. Consequently it held that only the 56,115 new shares were taxable as an original issue. It said (last two paragraphs, right column, 135 F.2d pages 579, 580):

"It was to defendant's interest to liquidate its unpaid accumulated dividends and

to bring about a lower dividend for the future. When, with this end in view, defendant issued an 'equal amount of new stock for that part of the corporate assets represented by previously existing shares, it made no addition to its capital. It accomplished nothing other than replacement of older preferred stock with new, smaller dividend stock; the holders retained the same proportionate interests in the capital assets. The additional shares issued in satisfaction of unpaid dividends represented the only contribution to capital effectuated; that and that alone was an original issue [citing cases]. * * *

"But book entries alone are not decisive. Rio Grande Oil Co. v. Welch, 9 Cir., 101 F.2d 454. And, so here, we receive no enlightenment from the formal ledger capital set-up. The undisputed fact is that the old preferred stock was exchanged share for share and the dividend arrears satisfied by issuance of additional shares. Whatever the book entries, the only new thing that could properly have gone into the capital account was the contribution by the shareholders of their unpaid dividends to the corporation in consideration of which they received the additional shares."

Plaintiff contends that the transaction here was entirely analogous to the transaction in the Pure Oil case. It says that the only distinction between the two cases is that here plaintiff, instead of using the amount transferred from surplus to capital as the basis for issuing additional shares as a dividend, used it as the basis for increasing the capital liability per share from $94 to $100; that, in other words, instead of issuing one new share representing the same capital liability of $94 as the old share, and a separate share representing a capital liability of $6—as it might have done—it issued a single share representing a capital liability of $94 plus $6.

But this distinction is important. With respect to the 316,461 new shares issued in exchange for an equal number of old shares surrendered, plaintiff admits that the new certificates issued were for exactly the same number and in the same denominations as the old certificates surrendered. But 168,360.5 shares of the old no-par value stock had been originally issued at a value

of $100 per share and the new shares issued for such of them as were exchanged was stock of a par value of $100 each. Consequently, no increase in capital liability as to them was necessary. The transfer from surplus to capital can be related only to the old shares of no-par value stock issued originally at less than $100 per share. Furthermore, a total of 40,962 and 89/90 shares of the old stock had been reacquired at less than $100 per share and there is no showing as to how many of these shares were shares originally issued at $100 per share and how many were shares originally issued at less than $100 per share.

The fallacy in plaintiff's position is that it takes an average and assumes that each old share exchanged represented a capital liability of $93.9995 per share. If that were so, the amount transferred from surplus to capital might be treated as a distribution or a dividend, upon each share and an allocation made between the shares issued in payment of such distribution or dividend and the shares issued in exchange for the old stock; as was done in the Pure Oil case. But that is impossible here, for the shares as to which such a distribution or dividend might properly be said to have been made cannot be identified and segregated from the others. It was for this reason that plaintiff's claim for refund was rejected by the Commissioner.

Moreover, the tax is imposed upon each certificate issued. No tax is imposed upon the issuance of part of a certificate. As appears from the schedule attached to its claim for refund, plaintiff's position really is that the tax should have been imposed only on $6.0005 of each certificate issued. No support for this position can be found in the statute.

■ Being a revenue measure exclusively, the statute must not be narrowly construed. Raybestos-Manhattan Co. v. United States, 296 U.S. 60, 62, 56 S.Ct. 63, 80 L.Ed. 44, 102 A.L.R. 111. Apparent hardship to the taxpayer does not justify a departure from the literal language of the statute.

■ What was done, and not what might have been done, determines tax lia-

bility. Founders General Co. v. Hoey, 300 U.S. 268, 275, 57 S.Ct. 457, 81 L.Ed. 639. There must be a fixed and indisputable mode of ascertaining a stamp tax. New York ex rel. Hatch v. Reardon, 204 U.S. 152, 159, 27 S.Ct. 188, 51 L.Ed. 415, 9 Ann.Cas. 736.

Defendant presents an interesting argument to the effect that the transaction here was not an exchange of new Preferred Stock for old but was rather a purchase of the new stock by the old stockholders with the proceeds of the redemption of their old stock and that, therefore, the entire issue was properly taxed as an original issue. As I have concluded that the complaint must be dismissed, the validity of its argument need not be considered.

Plaintiff's motion for summary judgment is denied and defendant's motion is granted. Settle order on two days' notice.