## SOUTHERN PAC. CO. v. BERLINER.
### No. 12117.

United States Court of Appeals
Ninth Circuit.
Aug. 18, 1949.

George L. Buland and Frank J. Gallagher, San Francisco, Cal., for appellant.

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Melva M. Graney and Sumner Redstone, Sp. Assts. to Atty. Gen., Frank J. Hennessy, U. S. Atty., Elmer Collett, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before STEPHENS, HEALY and BONE, Circuit Judges.

HEALY, Circuit Judge.

The Southern Pacific Company paid under protest an amount of stamp taxes assessed under sections 1800 and 1802(a) of the Internal Revenue Code, 26 U.S.C.A. §§ 1800, 1802(a) and sued unsuccessfully to recover the payment.

The Company was organized under the laws of Kentucky.[1] In 1940 it had outstanding 3,772,763.0564 shares of capital stock having a par value of $100 a share, of which all but 210,157 shares were issued at par. The 210,157 shares were issued at a premium of $6,304,845 over par.[2] In 1940 the Company, pursuant to an amendment of its charter and with the approval of the Interstate Commerce Commission, issued in exchange for its then outstanding par value stock an identical number of shares of no-par value stock. The no-par shares were issued to the holders of the par value shares only, in exchange for the shares then held. In connection with the charter amendment and the exchange no new money was paid in and no property transferred to the Company.

As an operating carrier the Company was subject to the I.C.C.'s accounting regulations. At the time of the exchange the Commission's regulations and forms provided, among other things, for two accounts, numbered 751 and 753, respectively entitled "Capital Stock" and "Premium on Capital Stock." The stock account of the Company prior to the exchange was set forth in its balance sheets and in its annual reports to the Commission as follows:

Stock

| 751 Capital Stock | $377,276,305.64 |
|---|---|
| 753 Premium on Capital Stock | 6,304,845.00 |
| Total Stock | $383,581,150.64 |

After the change from par value to no-par stock the Company's accounts were identical with what they had been immediately prior thereto, except that the amounts in the two accounts mentioned were merged and the total of the two was placed in Capital Stock account 751. Subsequent to the exchange the Company's stock account, as shown in its balance

---

[1] In the course of the litigation it was reincorporated in the state of Delaware, and the new corporation, appellant here, was substituted as plaintiff.

[2] Without going into details, it suffices to say that this premium was received as a result of the conversion into stock of outstanding bonds under an option entitling the owners to purchase stock at stated amounts in excess of par.

sheets and in its reports, was carried as follows:

Stock
751 Capital Stock ........ $383,581,150.64
753 Premium on Capital
    Stock .............     ———
                       ——————
    Total Stock...... $383,581,150.64

It should be added at this point that the Commission's accounting regulations provided for certain other accounts, pertaining to surplus. These were numbered 779 to 784 and were severally entitled "Additions to Property Through Income and Surplus," "Funded Debt Retired Through Income and Surplus," "Sinking Fund Reserves," "Miscellaneous Fund Reserves," "Appropriated Surplus Not Specifically Invested," and "Profit and Loss—Balance." Following upon the exchange there was no adjustment of or change in the latter accounts.

The Commissioner determined that the transfer of the amount previously listed as "Premium on Capital Stock" to the Capital Stock account resulted in the dedication of additional capital, upon which no previous issue tax had ever been paid; and that the new and old capital were so intermingled that it was impossible to allocate to the new capital any of the no-par value shares, hence the entire issue of no-par stock was subject to the stamp tax as an original issue.[3] The dispute here, as developed in briefs and oral argument and in supplemental memoranda later filed by counsel, narrows down to the single question whether the Commissioner was right in finding that the exchange effected an increase in capital account. Treasury Regulation 71, art. 29(i), in effect at the date of the exchange, is relied on by both parties. It cites as an example of an issue not subject to the tax: "(i) The issue by a corporation of certificates of stock in exchange for outstanding certificates of its own stock *where such exchange is effected* *without the capital of the corporation being increased, either by transfer of surplus ` to capital account or otherwise."* [Emphasis supplied.]

The Company contends that the Commissioner's ruling stems from a misconception of the meaning of the pertinent provisions of the accounting classification of the Interstate Commerce Commission, and of its own action taken in compliance therewith. It says that "premium on capital stock," though usually not included in capital in the legalistic sense, nevertheless is capital in the sense in which the accounts are carried under the controlling classification prescribed by the Commission. The Commission's classification, it says, did not treat the amount carried in account 753 as paid-in surplus, but as part of the frozen capital of the Company, all surplus being gathered into accounts 779–784. Accordingly, it contends that under the regulations of the Commission the amount carried in account 753 constituted prior to the exchange an integral part of the Company's fixed capital. On this construction of the paramount administrative requirements it urges that no addition to capital resulted from the transfer of the premium to the Capital Stock account.

The Commission's position on this subject is obviously important, and may be assumed to be controlling. But we are unable to agree that its position is as the Company insists. In describing what shall be included in premium account 753, the Commission's uniform system of accounts for steam railroads states: "This account shall include the total of the net credit balances in the discount and premium accounts for the several subclasses of capital stock.[4] (See Special Instructions, section 2)." The special instructions referred to are gathered in what is denominated "Classification of Income, Profit and Loss, and General Balance Sheet Accounts for Steam Roads, Issue of 1914." Section 2 of the special instructions reads as follows:

---

[3] Cf. Rio Grande Oil Co. v. Welch, 9 Cir., 101 F.2d 454; W. T. Grant Co. v. Duggan, 2 Cir., 94 F.2d 859; American Gas & Electric Co. v. United States, D.C., 69 F.Supp. 614.

[4] The phrase "subclasses of capital stock" evidently has reference to the subclasses enumerated in account 751.

674

"2. Discount and premium on capital stock.

\* \* \* \* \* \*

"In case the accounting company is permitted and elects to distribute all or any part of the net premium on its capital stock to its stockholders, the amount thus distributed shall be charged to the premium account."

█ The language of the instruction indicates that premium on capital stock is not regarded as necessarily a part of the carrier's fixed capital, but that where permissible it is distributable to stockholders as paid-in surplus. In this respect the Commission appears to defer to the law of the state of the carrier's incorporation. If by that law the premium is distributable as surplus the carrier is at liberty so to treat it; otherwise not. In short, the nature of the premium account, whether capital or surplus, is to be determined by reference to state law. Appellee cites Kentucky authorities affirming the legality and propriety of the sale of par stock at a premium so as to create a paid-in surplus. Lewis, Secretary of State, v. Oscar C. Wright Co., 234 Ky. 814, 816, 29 S.W.2d 566. Cf. also Peake v. Thomas, 222 Ky. 405, 407, 300 S.W. 885. The Company does not seriously contend that the amount here carried in premium account was not, under Kentucky law, a species of surplus subject to dividend appropriations. Its argument is that this is not the universal concept, and is not in any event the concept of the Interstate Commerce Commission. It says that the quoted instruction is "inapposite." The only reason advanced for so regarding it is that it is said to be in contravention of section 20a(12) of the Interstate Commerce Act, 49 U.S.C.A. § 20a(12), making it unlawful for any officer or director of any carrier "to participate in the making or paying of any dividends of an operating carrier from any funds properly included in capital account." The appeal to this statutory prohibition obviously begs the very point in issue.

█ The Company suggests that if the amount in account. 753 was surplus before the exchange it remained surplus after the exchange it remained surplus after er it was transferred. The corporate directorate, it insists, did not intend to effect any increase in capital. In respect of the latter proposition we agree that the record affords no clear picture of what the directors thought they were accomplishing by the disposition made of the premium account; and this state of confusion gives rise to the only substantial difficulty in the case. As this court observed in the cognate case of Rio Grande Oil Company v. Welch, 9 Cir., 101 F.2d 454, 456, an increase or decrease in the stated capital of a corporation effects a fundamental change in the corporate structure; and book entries alone are not decisive of the matter. But we are satisfied that the corporate action taken in this instance, considered in the light of the Commission's grant of authority for the charter amendment, compels the conclusion that a dedication of additional capital in fact occurred.

As set out in the record, the pertinent portion of the Commission's report on the Company's application states: "The applicant proposes to amend its articles of incorporation to change its authorized capital stock from shares with a par value of $100 a share to shares without nominal or par value, the number of authorized shares to remain unchanged. Of the total authorized shares, 3,722,763.0564 will be issued to the holders of the outstanding stock, upon the surrender of the outstanding certificates, on a share for share basis *and will be entered in the applicant's capital stock account at $383,581,150.64, representing the par value and premium on its outstanding stock.*" [Emphasis supplied.] While it does not appear from this that the Commission actively imposed a requirement that the amount in the premium account be transferred to capital stock account, nevertheless it approved the Company's application embracing a proposal to make such a transfer. It cannot be assumed that the Commission was unaware of the significance of the proposed transfer, or that it would have granted the desired authority on terms short of those submitted by the carrier.

Affirmed.