**ALLIED CHEMICAL & DYE CORPO-
RATION, Plaintiff,**

v.

**Denis J. McMAHON, Individually and as
District Director of Internal Revenue
for Lower Manhattan, New York, De-
fendant.**

United States District Court
S. D. New York.

March 30, 1957.

Lawrence A. Coleman, New York City, for plaintiff.

Paul W. Williams, U. S. Atty., New York City, George M. Vetter, Jr., Asst. U. S. Atty., New York City, of counsel, for defendant.

WALSH, District Judge.

This is an action to recover an alleged overpayment of the documentary stamp tax, in the amount of $49,817.25. Both parties move for summary judgment. Defendant's motion is granted; plaintiff's motion is denied.

The controversy grows out of a recapitalization of the plaintiff, in the year 1950, in which it issued to the holder of each share of common stock three additional shares of the same stated value. Plaintiff claims that the new stock certificates were not taxable because they were not accompanied by a dedication of additional capital. Defendant claims that they were.

Both motions are based upon a stipulation of the underlying facts.

Plaintiff, a New York corporation, was organized on December 17, 1920, to acquire the stock of five constituent companies. It issued preferred stock with a par value of $100 a share and no-par common stock with a stated value of $5 a share in a combined amount of $48,043,675.[1] This amount was entered upon its books in its capital stock account.

In March, 1921 plaintiff's certificate of incorporation was amended to state its total capital in the amount of $113,043,675. This was to conform with the then existing New York statute which required corporations to state their capital upon the basis of the stated value of

---

1. The stamp tax was paid, as provided by law, upon the face value of the preferred stock, $37,326,400 and upon the actual value of the common, $137,086,281. This value, in turn, was fixed upon the book value of the stock of the constituent corporations for which plaintiff's stock was exchanged, approximately $174,412,681, and deducting therefrom the face value of the preferred. An additional tax was paid as more stock was issued between 1921 and 1924 to complete the acquisition of the stock of the constituent corporations.

The acquisition of all of the stock of the constituent corporations was not completed until 1924. Its value when acquired is stipulated to have been $175,960,813. The actual value of the stock acquired upon the date of incorporation does not appear in the stipulation but on January 1, 1921, fourteen days after organization, the corporation's surplus was $126,369,006. Apparently therefore the value of the original stock upon which a stamp tax was paid was approximately $174,412,681, which is the sum of the surplus and the capital stock accounts.

their *authorized* stock rather than *issued* stock.[2] No new stock was issued. The surplus account was divided into two accounts, "capital surplus" and "further surplus". The capital surplus account was fixed at the difference between the capital stock account, and the amount stated as capital in the certificate of incorporation, $113,043,675. No tax was paid as the result of this transaction.

In 1930 and 1931 plaintiff issued to each holder of twenty shares one additional share of common stock with a stated value of $5 a share. The capital stock account was increased to show the addition of the newly issued shares at this stated value. The capital surplus account was reduced by the same amount so that it continued to maintain the difference between the total of the capital stock account and the amount of $113,043,675 stated as capital in the certificate of incorporation.[3] The stipulation of facts does not disclose whether a stamp tax was paid.

In 1936 the entire issue of preferred stock was retired. Although the stipulation of facts is silent as to how this was accomplished, apparently the holders of this stock were paid off in cash. The capital stock account was reduced by the aggregate par value of the preferred and this reduction was apparently offset by a reduction of the cash account. At the same time it became necessary to increase the capital surplus account so that it would continue to express the difference between the reduced capital stock account and $113,043,675, the amount stated as capital in the certificate of incorporation. This was done by transferring from "Further Surplus" an amount equal to the par value of the retired stock.

On August 1, 1950, the instant recapitalization occurred. Three additional shares of stock with a stated value of $5 a share were issued to the holders of each share outstanding. An amount equal to the stated value of these additional shares was added to the capital stock account. A corresponding reduction was made in the capital surplus account so that it continued to express the difference between the issued capital stock and the amount stated as capital in the certificate of incorporation.[4]

For purposes of comparison the capital stock and surplus accounts appeared as follows on January 1, 1921, December 31, 1921, 1924, 1931, 1936 and August 1, 1950:

|  | Jan. 1, 1921 | Dec. 31, 1921 | Dec. 31, 1924 | Dec. 31, 1931 | Dec. 31, 1936 | Aug. 1, 1950 |
|---|---|---|---|---|---|---|
| Capital Stock— |  |  |  |  |  |  |
| Preferred Stock | $ 37,326,400 | $ 38,951,700 | $ 39,284,900 | $ 39,284,900 | $.......... | $......... |
| Common Stock | 10,717,275 | 10,847,195 | 10,890,545 | 12,006,440 | 12,006,440 | 44,281,290 |
| Total | $ 48,043,675 | $ 49,798,895 | $ 50,175,445 | $ 51,291,340 | $ 12,006,440 | $44,281,290 |
| Surplus— |  |  |  |  |  |  |
| Capital Surplus | $126,369,006 | $ 63,244,780 | $ 62,868,230 | $ 61,752,335 | $101,037,235 | $68,761,695 |
| Further Surplus |  | 59,414,300 | 78,419,869 | 103,416,917 | 69,073,984 | (Not given) |
| Total | $126,369,006 | $122,659,080 | $141,288,099 | $165,169,252 | $170,111,219 | $68,761,695 |

In 1950, Section 1800 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 1800, imposed a tax on certificates of stock measured, as provided in Section

2. New York Stock Corporation Law, McK.Consol.Laws, c. 59, § 19 (now § 12). On May 11, 1921, a few weeks later, this statute was amended to permit the stated value of a corporation to be based upon *issued* rather than *authorized* shares and it has continued to so provide to date.

3. Plaintiff, until 1950, never took advantage of the 1921 change in the New York statute which would have permitted it to amend its certificate of incorporation to restate capital on the basis of *issued* shares rather than *authorized* shares.

4. Although the certificate of incorporation was amended it continued to provide that the "capital of the corporation shall not be less than" $113,043,675.

1802(a), 26 U.S.C.A. § 1802(a), as follows:

"On each original issue, * * * of shares or certificates of stock, * * * *Provided further,* That where such certificates * * * are issued in a recapitalization, the tax payable shall be that proportion of the tax computed on such certificates * * * that the amount dedicated as capital for the first time by the recapitalization, whether by a transfer of earned surplus or otherwise, bears to the total par value (or actual value if no par stock)[5] of such certificates or shares issued in the recapitalization. * * * * "

The appropriate regulation, Regulation 71, 26 C.F.R. § 113.23(e)(1) (1949) provides as follows:

"Sec. 113.23—Rate and computation of tax.

\* \* \* \* \*

"(e) * * *

"(1) A tax is not payable with respect to stock issued in a recapitalization unless the recapitalization results in the dedication of an amount as capital which amount is so dedicated for the first time.

Thus, where a corporation transferred an amount from capital to capital surplus in a prior recapitalization, and such corporation in a subsequent or second recapitalization transfers such amount from capital surplus to capital under such circumstances that the amount so restored to capital is clearly identifiable, a tax is not payable with respect to the amount so rededicated as capital. However, the tax is payable with respect to a transfer of capital surplus to capital by way of a recapitalization where the amount so transferred had not been previously dedicated as capital. * * * [Regs. 71, 6 F.R. 6015, as amended by T.D. 5613, 13 F.R. 2407]."

Plaintiff claims that there was no dedication of capital whatever, that this was a mere stock split. The controversy turns on the meaning of the words "dedicated as capital" as used in the statute.

"Capital", in the sense of the original investment by the owners of a corporation, is usually shown in the capital stock account.[6] According to the type of stock, this is the aggregate of the par value or the stated value or the actual value of the shares issued. This account remains unchanged except insofar as the stockholders contribute additional funds to the corporation or withdraw their original investment from it. The fluctuation in the value of the business is not shown by a change in this account but rather by the fluctuations of the surplus account.

"Capital" in a less precise sense is also used to describe the proprietorship interest of the owners of the corporation at any given time. In this sense it is shown by the total of the capital stock and the surplus accounts. The surplus account may be derived from earnings or from amounts paid into the corporation from various sources, including contri-

---

5. The regulations, 26 C.F.R. § 113.23(c), state that "where stock has no par value, the rate of tax is determined by the actual value of each share * * *". The following provision of the regulations, however, seems to be the one under which the tax was computed:

"(1) The actual value of stock not having a par value shall be determined on the basis of the market value of the stock at the time of issuance. If there is no ascertainable market value of the stock at the time of issuance, the actual value must be determined on the basis of all the facts and circumstances of the particular case." 26 C.F.R. 23(c) (1).

In the present case the tax was based upon the difference between the *stated* value of the shares and the stated value of shares previously issued as shown by the *capital* stock account. Neither party contends that the statute would require any other basis for determining the "actual" value of no par stock.

6. Kester, Accounting, Theory and Practice, 3d Ed., p. 344; Saliers, Accountants' Handbook, p. 1363.

butions or payments by stockholders in excess of the amounts shown in the capital stock account. Capital in this sense, however, is not spoken of as "dedicated". Capital in this sense is simply the excess of assets over liabilities at the time in question.

■ It is my belief that the statute uses "capital" in the former sense, meaning the contribution of the stockholders to the corporation. In such a sense it is shown by the capital stock account.

Plaintiff, however, eschews the use of the word "capital" in either of these senses. It claims that the word must be used in whatever sense defined by the statutes of the state of a taxpayer's residence or incorporation. In the present case, it claims, this would be the $113,043,675, stated as "capital" in plaintiff's certificate of incorporation.

Viewed on the basis of accounting theory, this figure is completely artificial. It was based upon its *authorized* stock. It was and has always been unrelated to either the stated value or the actual value of plaintiff's issued stock or the stated or the actual value of the investment of the stockholders. It has always been equally unrelated to the tax paid upon plaintiff's stock, either in determining whether a tax should be paid or the amount of the tax.

Plaintiff protests that the New York statute provides that the capital of a corporation shall be the amount stated in its certificate of incorporation.[7] But

although this amount may furnish a satisfactory basis for state regulation, for the protection of creditors, and for other state policies, it must not be used to distort the uniform application of a national tax. See Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77 L.Ed. 199; Lyeth v. Hoey, 305 U.S. 188, 193, 59 S.Ct. 155, 83 L.Ed. 119; United States v. Pelzer, 312 U.S. 399, 402, 61 S.Ct. 659, 85 L.Ed. 913; City Athletic Club v. United States, 2 Cir., 242 F.2d 43. See Com'r of Internal Revenue v. Estate of Bedford, 325 U.S. 283, 292, 65 S.Ct. 1157, 89 L.Ed. 1611. Cf. Rowen v. Commissioner of Internal Revenue, 2 Cir., 215 F.2d 641, 648. Here, the elementary nature of this term, the elementary sense in which it is used, its uniform meaning in the science of accounting, and its primary importance to the application of the tax, make it both unnecessary and unlikely that Congress intended to draw its meaning from varying state statutes providing for corporate regulation. Further, the artificial nature of the suggested state definition, which would measure capital in terms of authorized rather than issued stock, would require its rejection in the absence of an express mandate to refer to it. It could not be implied that Congress intended to incorporate so artificial a definition and one so likely to distort the application of the tax. The state definition suggested is not a refinement of a generally accepted meaning of the term "capital"; it is in conflict with its common meaning.[8] The state law must, of course, be

---

7. N.Y.Stock Corporation Law, § 13 (formerly numbered § 23) states:
   "§ 13. Capital
   "For the purpose of any rule of law or of any statutory provision relating to the amount of the capital of a stock corporation, the capital of any corporation authorized to issue shares without par value shall be deemed to be an amount computed in accordance with the statements respecting its capital contained in its certificate of incorporation or other certificate filed pursuant to law, or in a special law creating the corporation; and the capital of any corporation not authorized to issue shares without nominal or par value shall be deemed to be

the aggregate par value of its issued shares plus such amounts as, from time to time, may be transferred to capital by resolution of the board of directors."

8. It is noteworthy that the term "capital", as so defined, is not used as the basis of any state tax. Where capital becomes significant for tax purposes the statute gives its own definition of "capital", N.Y. Tax Law, McK.Consol.Laws, c. 60, §§ 186, 208, or uses a substitute term, e. g., "authorized shares" and "capital stock" § 180; "paid-in capital" § 182; or "capital stock" §§ 183, 184, 185. Section 182 which refers to foreign corporations uses "capital" in an altogether

understood in order to appraise the corporate transaction involved; see Southern Pac. Co. v. Berliner, D.C.N.D.Cal., 78 F.Supp. 696, 698, affirmed 9 Cir., 176 F.2d 671; Rio Grande Oil Co. v. Welch, 9 Cir., 101 F.2d 454, 456; Cleveland Provision Co. v. Weiss, D.C.N.D.Ohio, 4 F.2d 408, 411; but that is not to say that identical transactions by corporations of different states, each showing a dedication of capital on the books of account, will be taxed differently because in one state a statute defines "capital" to mean something other than it would mean in general usage or in the usage of accountants.

■ Further, when it is appreciated that we are here dealing with a tax on shares or certificates as issued, not on capital as such;[9] and that the purpose of the proviso in question was simply to avoid the inequity of taxing as new shares those which, with respect to previously dedicated capital, merely superseded previously issued shares, which had already been taxed;[10] then it becomes clear that, regardless of how many meanings "capital" may have in other contexts, Congress intended for it to be defined here in the sense most closely identified with the shares or the certificates which were the subject of the tax, that is as measured by the capital stock account as kept in accordance with the usual practice of accountants.

■ This view is supported by the history of the controversy which, in 1947, resulted in the addition to the statute of the proviso in question. There was at that time no question but that a mere exchange of shares unaccompanied by an increase in capital was no basis for this tax.[11] The question arose, however,

as to the tax to be imposed if there was an issue supported in part by previously dedicated capital and in part by new. Rio Grande Oil Co. v. Welch, 9 Cir., 101 F.2d 454, and subsequently Southern Pacific Co. v. Berliner, 9 Cir., 176 F.2d 671, held that in such cases the entire issue was taxable. United States v. Pure Oil Co., 7 Cir., 135 F.2d 578, held that only the proportion of the new shares equal to the proportion of new capital was taxable. By adding the present proviso Congress clarified the pre-existing statute in favor of the Pure Oil holding. See Crown Cork & Seal Co., Inc., v. United States, 94 F.Supp. 117, 120, 118 Ct.Cl. 156. Looking to the Pure Oil case for the test to be applied, its language in 135 F.2d at page 579 is:

"The statute clearly indicates that, to be taxable, certificates must be, in point of time, the first issued, whereby the issuing corporation certifies ownership by its shareholders of their aliquot parts of the capital represented by the certificates."

Accordingly, the test is when did the corporation first certify *by issuing shares or certificates,* that its shareholders owned their aliquot parts of the capital represented by the certificates in question.

In the present case, the increase in the "capital" stated in the certificate of incorporation was unrelated to the issuance of shares. In point of time it actually followed the issuance of most of them. Plaintiff did nothing by way of issuing new shares or restating upon its books the value of the old which would show that corporate stockholders "owned

---

different sense because, of course, the N. Y. Stock Corporation Law would not be applicable to foreign corporations.

9. United States v. National Sugar Refining Co., D.C.S.D.N.Y., 113 F.Supp. 157; F. & M. Schaefer Brewing Co. v. United States, D.C.E.D.N.Y., 130 F.Supp. 322. There have been periods when there was a concurrent tax on capital. Revenue Act of 1918, 40 Stat. 1057, 1126, 1133, 1135, 65th Cong., 3d Sess.; Reve-

nue Act of 1939, 53 Stat. 169, 196, Part I, 76th Cong., 1st Sess.

10. H.Rep 969, 80th Cong, 1st Sess.; S. Rep. 713, 80th Cong., 1st Sess.; 1947 U.S. Code & Congressional Service 1683, 1684.

11. Treasury Regulations 71, 26 C.F.R. § 113.23(e) (1); Edwards v. Wabash Ry. Co., 2 Cir., 264 F. 610, 614; See W. T. Grant Co. v. Duggan, 2 Cir., 94 F.2d 859.

their aliquot shares" of the new amount stated in the certificate of incorporation.

What plaintiff seeks to do is to escape a tax based upon the *issuance* of shares by pointing to a figure in its certificate of incorporation based upon its total *authorized* shares. If its contention were accepted all of its unissued stock would become eligible for issue tax-free. This would be a cynical parody upon Congress' intent. Congress sought to avoid the danger of a double tax. It did not intend for any corporation to escape the original tax. Plaintiff was not the object of Congress' protection because it had not, by stating its capital on the basis of its authorized rather than its issued shares, become liable for a tax or exposed itself to a double tax. Only by the actual issue of shares could there have been such an exposure.

Plaintiff's designation of a portion of its surplus account as "capital surplus" did not constitute a dedication to capital. Accountants frequently divide surplus into various subdivisions but the various subdivisions remain part of the corporate surplus, regardless of how they are titled. For example, by state law, dividends may be payable only from earned surplus as distinguished from paid-in surplus and the surplus account may be thus divided, but both divisions remain corporate surplus. There is no dedication to capital in an accounting sense merely because state law may prevent the free disposition of part of the surplus. In fact, plaintiff never classified its "capital surplus" as part of its capital accounts (see Exhibit B attached to stipulation of facts). It was treated as part of the surplus account; its total was consistently combined with that of "further surplus" to reach the amount of total surplus. It was never combined with the capital stock account to show in the balance sheet a figure as total capital which would correspond to the $113,043,675, stated as capital in the certificate of incorporation.

Further, the Treasury regulation which for several years has interpreted the proviso (Regulation 71, 26 C.F.R. § 113.23(e)(1) uses the term "capital surplus" as something clearly outside the concept of capital. It provides:

"* * * Thus, where a corporation transferred an amount from *capital* to *capital surplus* in a prior recapitalization, and such corporation in a subsequent or second recapitalization transfers such amount from *capital surplus* to *capital* * * * a tax is not payable with respect to the amount *so rededicated as capital*." (Emphasis added.)

Actually the so-called "capital surplus" is merely a paid-in surplus, part of the excess of the amount paid for the plaintiff's stock over the value of the stock stated on its books. It is entitled to no more favorable consideration than premiums frequently paid for par value stock. United States Steel Corporation v. United States, Ct.Cl., 142 F.Supp. 948, 952, held taxable an issue of stock based upon a "capital surplus" created from such premiums.

Plaintiff's final claim is that the capital underlying the recapitalization was merely a rededication of capital which had previously supported the preferred stock which was retired in 1936. This cannot be, because the capital which underlay the preferred stock was returned to the investors in cash when the stock was redeemed.[12] The capital stock was reduced not by transfer to capital surplus, as might occur if the stated value of the stock were reduced, but by redemption for cash. Although it did

---

12. The stipulation of facts is incomplete; if the only book entries made were those described, the books would have been left out of balance. It does state, however, that the preferred stock was redeemed and cancelled and the consolidated general balance sheet (Exhibit B) shows that this was accompanied by a reduction in the cash account and by holdings in government securities. Therefore the entry which was omitted from the stipulation is a credit to cash in the amount paid for the redemption of the stock.

then become necessary to increase the capital surplus account to fill the gap between the shrunken capital stock account and the $113,043,675 stated as capital in the certificate of incorporation, this increase was made possible, as stated in the stipulation, by a transfer to capital surplus from further surplus, an account which has not in any sense ever been claimed to have been dedicated as capital.

Defendant's motion for summary judgment is granted. Complaint dismissed.